STATE OF HAWAII, by its Attorney General, Plaintiff-Appellant, *v.* DILLINGHAM CORPORATION, a Hawaii corporation, Defendant-Appellee, and CITY AND COUNTY OF HONOLULU, et al., Defendants

NO. 6125

FEBRUARY 26, 1979

RICHARDSON, C.J., OGATA, MENOR AND KIDWELL, JJ., AND RETIRED JUSTICE KOBAYASHI ASSIGNED BY REASON OF VACANCY

394

OPINION OF THE COURT BY KOBAYASHI, J.

This is an appeal by the State of Hawaii (appellant) from a jury verdict below awarding Dillingham Corporation (appellee), a Hawaii corporation, $1,500,000.00 as just compensation for lands taken in an eminent domain proceeding.
We affirm.

### ISSUES

I. Whether the trial court was required to rule as a matter of law that the condemned property was not subdividable.

II. Whether the trial court committed prejudicial error in instructing the jury on the lot width definition contained in § 21-201 of the City's Comprehensive Zoning Code (Code).

III. Whether the trial court erred in admitting evidence of comparable sales presented by appellee's appraiser.

### STATEMENT OF THE CASE

In a complaint filed on November 28, 1973, the State of Hawaii sought to condemn certain lands on Oahu, Hawaii, designated as Parcels 6, 8, 8-A, 8-B, 24-A, 24-B and 25 (hereinafter referred to as "property") to be used for the

construction of a public highway.[1] Most of the property consisted of a 40 foot wide strip of land approximately 2.5 miles long, constituting an area of 12.754 acres. The property ran between Nimitz and Kamehameha highways from Puuloa Road, past the Honolulu International Airport, to an access road connecting the two highways. Both highways consisted of four lanes of traffic, Kamehameha Highway being separated into two separate lanes of traffic by a medial strip. On the makai (seaward) side of Nimitz Highway, the adjacent lands were zoned industrial and residential. On the mauka (mountain) side of Kamehameha Highway, the adjacent lands were used by the military for residential purposes. The property was owned entirely in fee simple by the Dillingham Corporation (appellee), subject to easements by Standard Oil Company of California, Hawaiian Electric Co., Inc., the City and County of Honolulu, and the Board of Water Supply.[2] At the time the complaint was filed, the property was zoned R-6, Residential.

Upon conclusion of the trial, the jury rendered a verdict in the sum of $1.5 million for the appellee. The sole factual issue to be determined was the fair market value of the property.

### STATEMENT OF FACTS

At trial, appellant presented the testimony of Noboru Yokoyama, a land surveyor for the State Department of Transportation, Robert Way, Chief Planning Officer for the City and County of Honolulu (City), George Moriguchi, Director of Land Utilization for the City, Joseph Samaritano, Director of the Real Estate Division of the Naval Facilities, United States Navy, Mitsuo Shimizu, a real estate appraiser,

---

[1] The public highway was designated as Interstate Highway, Federal Aid Project No. I-HI-1(15), Pearl Harbor Interchange and Nimitz Spur, and Federal Aid Project No. I-HI-1(81), Pearl Harbor Interchange to West Ahua Street, Oahu, Hawaii.

[2] Standard Oil Co. of California, Hawaiian Electric Co., Inc.. and the Board of Water Supply subsequently entered into stipulations with the appellant for entry of judgment subject to existing easements.

Richard Senelly, a planner and part owner of a private corporation, and Walter W. L. Loo, a real estate appraiser and realtor.

On direct examination Robert Way testified that as Chief Planning Officer, his functions included preparation of the City's General Plan[3] and development plans, and advising the mayor and city council on planning matters. The General Plan designated the property for use as a roadway. Any proposed changes to the General Plan regarding the property would be initially referred to Mr. Way for evaluation. Mr. Way testified that, if an application for an amendment modifying the designated property use for the property were to be submitted to him, he would simply "not propose a change to the General Plan" or, if the matter were referred to the planning commission[4] and then to the city council, he would submit a negative recommendation to the city council. The reason for a negative recommendation would be because of the "strong public need for right-of-way use." The final decision on whether to approve a proposed amendment to the General Plan rested with the city council and the mayor. In matters concerning rezoning of land, Mr. Way testified that applicants for zoning changes would be required to submit requests to his office for review and comment. Mr. Way testified that he would not recommend a zoning change of the property from residential to industrial because such a change would not conform to existing ordinances, the General Plan and Development Plan, and because the "existing information shows that the area is for right-of-way purposes."

On cross-examination, Mr. Way testified that by looking at the General Plan and the Detailed Land Use Map (DLUM), he could not identify precisely the use designations of several of the condemned parcels. However, he said that he was

---

[3] The General Plan of the city, adopted in 1964, explains the long range planning for land use in the City and County of Honolulu. The Plan, the Detailed Land Use Maps, and the Development plan delineate the city's overall land use policy.

[4] Charter of the City and County of Honolulu § 5-413-1 (1973).

aware in 1964 of the proposed major roadway to be constructed in the area and that the fact that the area of the property was planned for a roadway would affect his decision as to any proposed changes in land use. Mr. Way testified that he was not aware that in condemnation proceedings, that the plans to build public improvements on the property could not be considered in valuation of the land.

On direct examination as a rebuttal witness Mr. Way testified that prior to 1964, a document was prepared by the Planning Department called the General Plan for Urban and Urbanizing Areas, together with map illustrations. The map designated the area of the property as "future highway system". Hence, at the time of the adoption of the General Plan, it had already been determined that a federal highway would be constructed in the area.

On redirect, Mr. Way testified that as zoned, and provided the property met the other requirements, such as subdivision regulations, the property could be subdivided.

On direct examination, George Moriguchi testified that as Director of the Land Utilization for the city, his basic functions were to administer the city's zoning ordinances, as found in the City's Comprehensive Zoning Code (Code),[5] and the Subdivision Rules and Regulations.[6] Under the provisions of the Subdivision Rules and Regulations, he was charged with reviewing all subdivision applications and with making a determination as to whether applications should be approved or not. Final approval for subdivision applications rested with

---

[5] This Code was adopted by the city council and made effective as of January 2, 1969. The Code established various land use districts within the City and County of Honolulu.

[6] The Subdivision Rules and Regulations were adopted by the city's Planning Commission and made effective as of June 20, 1973. It established guidelines of subdivision approval, and defines "subdivision" as follows:

> Subdivision is the division of land into two or more lots, parcels, or other division of land, including designation of easements. for the purpose, whether immediate or future, of sale, lease, rental, transfer of title to or interest in, any or all of such lots or other division and shall include resubdivision.

him as Director.[7] When questioned as to whether or not he would approve application for subdivision of the property, Mr. Moriguchi replied: "I probably would not, not knowing exactly what kind of subdivision you're talking about. But generally, I probably would not." When asked why he would not recommend a subdivision, he replied:

> First of all, I would know that the General Plan called for the use of this land as a highway. Secondly, I would be concerned about the fact that it's only 40 feet wide and generally, the residential lots require 50 feet minimum lot width and that fact makes it a non-conforming lot and the Code frowns on further changes in area or width of non-conforming lots. And so I would generally not favorably consider it.

Mr. Moriguchi further testified that he would not recommend to the city council a zoning change for the property to either industrial or commercial,[8] that he would "probably" not recommend approval for a planned development in the area, and that he would not recommend to the City's Building Superintendent that any residential use be permitted on the property. In regard to what the maximum permissible use of the property would be under the present R-6 zoning, he said the following:

> The Codes indicates that no one would be deprived of the use for a single-family purpose. . . . In ordinary circumstances, with a lot within a residential area, this has been followed. But in this particular instance, in the

---

[7] The Honolulu City Charter, Chapter 10, Section 6-1009, provides that the Director's decisions regarding subdivision applications are appealable to the Zoning Board of Appeals. The Director could be reversed if it was found that he had made a material mistake of fact, if his decision was arbitrary and capricious, or if he had abused his discretion in carrying out his duties.

[8] Mr. Moriguchi testified that the present zoning was inappropriate. However, Mr. Moriguchi would not comment as to possible zoning change for the property in view of this opinion. On redirect, Mr. Moriguchi testified that he would recommend a zoning change to a P-1 zoning which would permit open space type uses such as agricultural or recreational uses.

middle of two highways, it imposes a different condition or it has a different significance of that situation and it becomes more severe or more critical.

The final decision as to whether or not a building permit would be issued would not depend on what I would do, but it would depend on the Building Superintendent.

I would not be inclined to recommend to the Building Superintendent that any residential use be permitted on this site. However, I might indicate generally, though, in other circumstances when we have non-conforming lots we have allowed at least a single-family residence. When a non-conforming lot has more than 10,000 square feet, we have allowed two single-family residences.

On cross-examination, Mr. Moriguchi testified that he measured the width of a lot by "the narrowest dimension of a parcel," and that this practice constituted an "administrative reading" of the measurement of the width of a lot. Mr. Moriguchi testified he could not find anything specific in the zoning code which defined lot width in this manner. He would classify the property as a non-conforming lot. On redirect examination Mr. Moriguchi testified that lot width was not defined in the Code.

On cross examination, counsel for appellee apprised Mr. Moriguchi of § 21-201 of the Code, which defined "lot width" as follows:

The width of a zoning lot shall be determined by measuring across the rear of the required front yard; provided, however, the street line width of a zoning lot shall be determined by measurement across the width between the side lot lines of said zoning lot at the points where they intersect the street line. Said street line width shall not be less than 80% of the required minimum lot width. . . .[9]

---

[9] Section 21-553(b) of the Code establishes the lot width applicable to districts zoned as R-6 Residential as follows:

(1) For one-family detached dwellings, the minimum lot width shall be:

    (a) 50 feet, if the minimum lot area requirement is 5,000 square feet;

    (b) 70 feet, if the minimum lot area requirement is 7,500 square feet;

    . . . .

Mr. Moriguchi testified that if the Code's definition of lot width were to be applied to the property, the width of the lot could be measured along Nimitz Highway, in which event, the 50 foot width requirement would be met. On recross examination, Mr. Moriguchi admitted that when the Code was originally adopted, the method of measuring the width of a parcel would have been along the highway.

Witnesses Shimizu and Loo, as appraisers for the State, testified as to their opinions on the fair market value of the property. Both appraisers based their estimates on the assumption that the property could not be subdivided, and that the "highest and best use" of the property would be as presently zoned.[10] As presently zoned and providing that none of the parcels could be subdivided, a maximum of two residential buildings could be built on each of the parcels, thereby utilizing the first 10,000 square feet per parcel. Appellant's appraisers considered the footage in excess of 10,000 square feet per parcel to be "excess land" of "nominal value" only. Mr. Shimizu valued the excess footage at 4¢ per foot, whereas Mr. Loo valued the excess footage at 5¢ per square foot. Mr. Shimizu arrived at a total valuation price of $177,700 for parcels 6, 24-A, 24-B and 25, and Mr. Loo arrived at a total valuation of $158,350 for parcels 8-A, 8-B, and 8. The total valuation according to appellant's experts was approximately $336,000.

Both appraisers testified on cross examination that according to the literal meaning of "lot width" as contained in § 21-201 of the Code, the width of the parcels would be measured along one of the two highways and the width requirement for subdivision would be met.

Witnesses presented by appellee at trial were: George K. Houghtailing, president of Community Planning, Inc. and

---

[10] Mr. Shimizu testified on direct examination that although he first considered the possibility of the property being rezoned to industrial use, after discussing the matter with Mr. Way he concluded that there was "no hope" that the General Plan would be changed. Also, after discussing the possibility of subdividing the property with Mr. Moriguchi, Mr. Shimizu concluded that the "highest and best use" of the property would be as residential use as presently zoned.

licensed civil engineer; Louis D. Loucks, a licensed architect; and Y. T. Lum, an independent fee appraiser and counsellor in real estate.

In regard to the subdividability of the property, Mr. Houghtailing testified that although the City's General Plan and DLUM designated the property as military and highway, the property was zoned for residential and the zoning determined the uses to which the property could be put. Under the R-6 zoning and under the relevant provisions of the Code, use of the land for residential dwellings was permissible. The 50 foot requirement for lot width could be met by measuring the front of the property along one of the two highways fronting the property. If this were to be done, in order to meet the Code lot area requirement of 5,000 square feet for a single residential dwelling, the lot would need to be measured along the highway for a minimum of 125 feet. Considering other factors such as proper access to the property and the availability of water, sewers, drainage, electrical and other power sources, Mr. Houghtailing concluded that the property could be subdivided.

In regard to the potentiality for rezoning of the property from residential to light industrial, Mr. Houghtailing testified that in his opinion, there was a reasonable probability of rezoning. He said that in considering whether or not to rezone a particular piece of property, the zoning authorities would consider the use of property nearby as one of the factors. Mr. Houghtailing believed that rezoning the property to light industrial would be compatible with the industrial and business purpose for which the surrounding area was being utilized.

Mr. Loucks also testified that the minimum 5,000 square feet for a single-family dwelling unit could be accomplished by measuring the lot width along the highway.

Y. T. Lum testified for appellee as to the fair market value of the property, using primarily the market data approach.

He testified that he researched all known transactions in the area of Halawa and Moanalua which took place close to November 28, 1973. Although unable to find any truly comparable property, he was able to locate several parcels having some similarity to the property. Mr. Lum researched the sales

of bulk, undeveloped land as well as developed land to obtain a range of values. Said sales were introduced into evidence over appellant's objections.

Mr. Lum emphasized that the sales were not comparable properties, but were being used as "data properties" upon which to base his opinion of value.[11] He also stated that the sales were not being offered as substantive evidence of value.

Mr. Lum testified that in his opinion, based on the conclusions reached by Mr. Houghtailing and Mr. Louck, the property had subdivision potential which market buyers would be aware of and would pay money for. On cross examination, Mr. Lum testified as follows:

> In other words, that potentiality enhances the value of the raw land. There couldn't be a stronger statement than this potentiality of subdivision enhances the value or increases the value of the raw land in its raw state.

Furthermore, in his opinion, there was a reasonable probability that the property could be rezoned. Mr. Lum testified as to the basis of his conclusion that the property could potentially be rezoned to light industrial:

> In five years time this land can probably change from residential to light industrial.
>
> And also based on the experiences of the past, what trends, what properties along that strip have been rezoned, and the demand prices, the pressure of urbanization, the pressure of industrial land. Now, don't forget, this land is very near the Honolulu Airport, and airport zoning in that area or commercial or industrial uses are very much in demand.
>
> Now, at one time that Damon Tract was housing — low-cost housing. And then it was airport zoning — industrial uses.

---

[11] Mr. Lum testified as follows:
Mind you — I'm going to make this statement before we all get confused. I am not saying that these properties are comparable properties. I'm saying I'm using these properties as data property on which to base an opinion of value, of the range of properties. It's the data or the bank of resources of market sales.

Mr. Lum concluded that the most rational way of utilizing the property would be to use the portion surrounded by naval housing development for residential purposes, and to use the portion surrounded by industrial use for industrial purposes. In order to use the portion surrounded by industrial uses for industrial purposes, the property would have to be rezoned. This would involve a change in the City's General Plan. Mr. Lum testified:

[B]ut that approval is dependent on circumstances of the area, on past experience, by informed buyers, engineers and by others, that you can make a proper discount that if in two years, three years, five years it could be done, then that value can also give you a check.

When asked whether City officials were experts on the interpretation of the General Plan and the subdivision rules and regulations, Mr. Lum replied:

Yes, they're supposed to be. But sometimes when they interpret it one time, it does not necessarily mean that that's the final decision to the very end. Many times, they've changed their interpretation and varies from one official to another official in these interpretations. And no plan is final until you go up there and then they put the stamp on the back and it had gone through all the departments that it has been approved, and that is the final plan.

Mr. Lum concluded from his studies that the highest and best use of the property would be as presently zoned for a portion of the property, and as potentially rezoned as light industrial for the remainder. As a summary to his testimony, Mr. Lum stated as follows:

[R]esidential land will sell as of the date, in my opinion after the study, $2.50 to $3.50 a square foot.

For light industrial, it will be $3.00 to $5.00 a square foot.

Now, by economic analysis, under the present legal zoning, all the land to be developed for residential purposes, it would come — if we apply the discount of two years — it will run somewheres around $2.24 to $2.97 a square foot. And if this can be accomplished in one year

— less time — it will run from $2.42 to $3.21. This is residential.

Now, then, for light industrial, for five years — industrial is a little difficult because you have to have rezoning, so I took five years — runs from $1.84 to $2.36. For three years, it will run from $2.14 to $2.74 — $2.76; a correction.

Now, the best combination which I think is the highest and best use — would be the present legal zoning for a portion — for a portion which contains 172,300 square feet. And that is from Kamehameha Highway, Nimitz crossover, to the Nimitz Gate. That section is about 172,300 square feet. And that is residential development. And if you discount it for two years, it will run $2.19 to $2.94. If you discount it one year, it will be $2.37 to $3.17.

Then for the industrial portion — that is, the industrial development for that portion from the Kamehameha-Nimitz crossover to Lagoon Drive — a little bit on this side of Lagoon Drive — for five years the discount would be $2.00 to $3.53. And for the three-year discount, it would be $2.33 to $2.95.

In his judgment, the property would sell for $3.00 per square foot. However, Mr. Lum discounted this price by 10% to account for the irregular shape and the legal encumbrances and easements of the property. Mr. Lum arrived at a final valuation price of $2.70 per square foot. The total value of the property was $1.5 million.

After the close of all the testimony, the court reviewed the requested instructions of both parties. Over the objection of the appellant, the court instructed the jury on the definition of "lot width" as contained in § 21-201 of the Code.[12]

---

[12] Defendant's instruction No. 11, given over the objection of appellant, was as follows:

The legal definition of lot width for each lot in a subdivision shall conform to the requirements of the Comprehensive Zoning Code which states:

The width of a zoning lot shall be determined by measuring across the rear of the required front yard; provided, however, the street line width of zoning lot shall be determined by measurement across the width between the side lot lines of said zoning lot at the points where they intersect the street line. Said street line width shall not be less than 80 percent of required minimum lot width.

Appellant objected to this instruction as follows:

[T]he plaintiff objects on the grounds that there is evidence to the effect that there is a practice in effect in interpreting this provision of the Comprehensive Zoning Code which has been in effect and practiced by the Land Utilization, as testified to by Mr. George Moriguchi, . . . that where a common practice in interpreting a provision of a zoning code or ordinance has been in effect, this in effect becomes law until so amended by legislative action.

. . . .

[T]he remaining instruction should be amended to reflect the current practice of the Department of Land Utilization of the City and County of Honolulu.

No instructions were given concerning appellant's evidence of Mr. Moriguchi's "administrative reading" of the measurement of the width of a lot for subdivision purposes.

The following instruction labeled defendant's Instruction No. 8 relative to weighing the opinion of experts was given by agreement:

Certain matters may be considered by witnesses in forming their opinion of the fair market value of the subject property and if evidence of such matters has been received it may be considered by you only for the limited purpose of enabling you to understand and weigh the testimony of the witnesses as to their opinion of the fair market value of the subject property.

Among those matters are:

. . . .

(3) The price and other circumstances of any sale or contract to sell and purchase of other properties which they consider to be comparable to defendant's property as shedding light on the value of the property being valued. Generally, the more similar one property is to another, the closer the value of the one may be expected to approach the value of the other. Thus, in weighing the opinion of a witness as to the value of the subject property based upon his reliance on sales or contracts to sell and purchase comparable properties, you should consider the

following matters: Was such sale or contract to sell and purchase freely made in good faith; how near November 28, 1973 the date of valuation of the defendant's property, is the date of the other sale; how near the size of the other property is the size of the defendant's property; how similar are the physical features, including both improvements and natural features; how similar is the use to which the other property is, or may be, put, to the use which is, or may be, made of the defendant's property; and how similar the neighborhood of the property is to the neighborhood of the defendant's property.

.    .    .    .

As you have been previously instructed, you may consider evidence of any of the foregoing matters only for the purpose of enabling you to understand and weigh the testimony of the witnesses as to their opinions of market value.

### OPINION

I. WHETHER THE TRIAL COURT WAS REQUIRED TO RULE AS A MATTER OF LAW THAT THE PROPERTY WAS NOT SUBDIVIDABLE.

Appellant argues that the testimony of the Director of Land Utilization, George Moriguchi, that he would "probably not" approve subdivision plans for the property and that his decision would not likely be overturned· on appeal to the Zoning Board was conclusive on the issue of subdividability. We disagree.

We start with the basic proposition that "[m]arket value is not limited to the value for the use to which the land is actually devoted, but it may have a potential use value." *City and County v. Market Place, Ltd.*, 55 Haw. 226, 242, 517 P.2d 7, 19 (1973), quoting from *Hawaii Housing Authority v. Rodrigues*, 43 Haw. 195 (1959). In determining the potential use value, the court in *Territory v. Adelmeyer*, 45 Haw. 144, 147, 363 P.2d 979, 982 (1961), said:

It is generally held that where the value of the property is material, any evidence which will aid the jury in fixing the

fair market value of the property should be considered by them. Any competent evidence of matters, not merely speculative, which would be considered by a prospective vendor and purchaser or which tend to enhance or depreciate the value of the property taken is admissible.

The record shows that there was conflicting testimony as to whether the property could meet the width requirements for subdivision, and whether a subdivision in the area of the property would be consistent with the City's General Plan and DLUM. Appellant's witnesses testified that the property was too narrow to meet requirements for subdivision, and use of the property for subdivision purposes would conflict with the City's designation of the area as a roadway. Appellee's witnesses testified that the property would meet the Code's lot width requirement, and as presently zoned, could be subdivided. Appellee's witness Lum maintained that even if there is no assurance that the property could actually be subdivided, the property had subdivision potential, such potential enhanced its value, and potential buyers would take the subdivision potential into consideration when investing their money to buy the land. Mr. Lum also testified that although City's officials were authorities on the interpretation of the General Plan and the subdivision rules and regulations, many times they have changed their interpretation and such interpretation varied from one official to another.

In this case, the question of subdividability of the property is not an issue which can be separated from the question of the property's "highest and best use," and ultimately, its fair market value. In *County of Hawaii v. Sotomura*, 55 Haw. 176, 185, 517 P.2d 57, 63-64, *cert. den.* 419 U.S. 872 (1973), we quoted in part from *Olson v. United States*, 292 U.S. 246, 255-56 (1934), the following:

Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. . . . The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use

affects the market value while the property is privately held. . . .

Subdividability or unsubdividability was merely one of the factors to be considered by the jury in determining fair market value. *Hawaii Housing Authority v. Rodrigues, supra.*

The evidence presented to the jury as to the property's highest and best use was conflicting. The appellant's witnesses testified that the highest and best use of the property was as presently zoned, residential. This conclusion was reached despite the fact that witness Moriguchi testified that the present zoning for the property was "inappropriate" for the area since the property was situated between two busy highways, and despite the fact that he would not recommend to the city's building superintendent that residential use be permitted. The appellee's witness testified that the highest and best use would be as rezoned for light industrial use for a portion of the property, and as residential for the remainder.[13]

We said in *Territory v. Adelmeyer, supra,* 45 Haw. at 163, 363 P.2d at 989, that experts' opinions vary and the "competence, credibility, and weight of their testimony is exclusively in the province of the jury." Where there is conflict as to the highest and best use of the property, the question is properly one left to the jury. *Alabama Power Co. v. Hamilton,* 342 So.2d 8 (Ala. 1977).

Appellant urges that Mr. Moriguchi's "administrative reading" of the width of a lot for subdivision purposes should be "afforded great weight." Appellant cites *State v. Park,* 55

---

[13] The opinion in the case of Poudre School District R-1 v. Stark, 536 P.2d 832 (Colo. App. 1975), *reversed on other grounds,* 560 P.2d 77 (Colo. App. 1977), recited the following factors as being significant in determining whether there was a reasonable probability of rezoning:

Rezoning of nearby property, growth patterns, change of use patterns and character of neighborhood, demand within the area for certain types of land use, sales of related or similar properties at prices reflecting anticipated rezoning, physical characteristics of the subject and of nearby properties, and under the proper circumstances, the age of the zoning ordinance. [Citation omitted.]

*See* Dep't of Transp. v. W. Nat'l Bank of Cicero, 63 Ill.2d 179, 347 N.E.2d 161 (1976); Knight v. State, 317 N.Y.S.2d 800, 36 A.D.2d 574 (1971).

Haw. 610, 525 P.2d 586 (1974), and *In re Castro*, 44 Haw. 455, 355 P.2d 46 (1960), for the proposition that the court is required to construe a statute where the literal construction of a statute leads to an absurd or unjust result.

There is little in the record to support appellant's contention that the literal interpretation of the definition of "lot width" in the Code necessarily leads to an absurd result. Moreover, Mr. Moriguchi's testimony contained inconsistencies which make it difficult for this court to determine whether he was interpreting § 21-201 of the Code or merely testifying as to an administrative practice. Mr. Moriguchi testified on cross examination that he knew of no provision in the Code that defined the width of a lot. When asked about § 21-201 of the Code, Mr. Moriguchi testified that as initially adopted and in accordance with the definition contained in § 21-201, the width of the property could have been measured along Nimitz Highway. Although appellant attempted to show on redirect examination that the literal interpretation of § 21-201 to a hypothetical lot two feet wide and sufficiently long to meet the total area requirements for subdivision would result in a lot which would be legally but not practically subdividable, on recross, appellee elicited testimony that there are requirements for rear and front yards which would prevent subdivision of such a parcel. Furthermore, although it may be true that the construction given to a statute by public officials whose duty it is to administer the statute is entitled to great weight, we have stated that "[n]either official construction nor usage, no matter how long indulged in, can be successfully invoked to defeat the purpose and effect of a statute which is free from ambiguity, nor will the courts be influenced by the construction placed upon a statute by the officials whose duty it is to execute it where such construction is manifestly incorrect." *Frank Nichols, Ltd. v. Vannatta*, 33 Haw. 602, 606 (1935). *See Kauai County v. Shiraishi*, 41 Haw. 156, 162 (1955). Virtually all witnesses who were asked to interpret § 21-201 of the Code agreed that as defined by the Code, lot width was to be measured along the street. In reference to the property, there was no dispute that the width of the lot could be measured along either Nimitz or Kameha-

meha Highways. We agree that the width of the lot can be so measured.

Appellant urges that the language in *Territory v. Trustees of Mendonca Estate*, 46 Haw. 83, 375 P.2d 6 (1963), established that the question of subdividability is a legal question. Appellant misconstrues the results in that case. In *Mendonca*, the trial court's conclusion that the Mendonca property was not subdividable as a matter of law was not an issue which was appealed. Hence, this court did not address the correctness of the trial court's determination on that issue. Furthermore, the property which the trial court held to be not subdividable was not the property under condemnation but the property remaining in the Mendonca estate after condemnation.

II. WHETHER THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN INSTRUCTING THE JURY ON THE LOT WIDTH DEFINITION CONTAINED IN THE CODE.

Appellant argues that the first paragraph of the instruction prejudicially restricted the definition of lot width to that found in the Code, and that the court should have instructed the jury that an administrative interpretation of an ambiguous statute is to be afforded "great weight." As we have stated above, the record does not support appellant's contention that the Code definition of "lot width" was ambiguous. Hence, there was no error in the court's refusal to instruct the jury as to weight to be given to Mr. Moriguchi's "administrative reading" of the measurement of lot width. Furthermore, the record shows that appellant did not submit a written memorandum to the court stating his request for this proposed point of law. Appellant cannot now complain. *Van Poole v. Nippu Jiji Co.*, 34 Haw. 354, 362 (1937).

III. WHETHER THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF COMPARABLE SALES PRESENTED BY APPELLEE'S APPRAISER.

Appellant argues that the court erred in admitting evidence of the sales presented by appellee's appraiser, Mr. Lum, on the grounds that the sales did not resemble the

property as to such factors as size, shape and character of the property, time of transaction, size, zoning, age, and location. *State v. Heirs of Kapahi*, 48 Haw. 101, 395 P.2d 932 (1964), 7 Nichols, Eminent Domain, § 13.03. Appellant objects to the sales, again on the basis that the sales were of land which was subdividable.

We have held in this jurisdiction that the trial judge has broad discretionary authority to admit or exclude evidence of comparable sales or leases and the exercise of discretion will not be upset on appeal unless there is a clear abuse of discretion. *State v. Martin*, 54 Haw. 167, 170, 504 P.2d 1223, 1225 (1973); *Honolulu Redevelopment Agency v. Pun Gun*, 49 Haw. 640, 645, 426 P.2d 324, 327 (1967); *City and County v. Bishop Trust Co.*, 48 Haw. 444, 464, 404 P.2d 373, 386 (1965); *State v. Heirs of Kapahi, supra,* 48 Haw. at 112-13, 395 P.2d at 939. We have also stated the following:

> It is well established that recent sales of similar real estates are admissible as evidence in condemnation cases, either as substantive proof of value of property taken or *in support of an expert's opinion as to value.* [Citations omitted.] If such evidence is offered on the latter basis, . . . *the foundation requirements to show similarity are less strict than when the evidence is used as direct and independent proof of value.* . . . [Emphasis added.]

*State v. Martin, supra,* 54 Haw. at 170, 504 P.2d at 1225.

In this jurisdiction, we have taken a liberal view toward the admission of evidence used to support an expert's opinion as to fair market value. *Honolulu Redevelopment Agency v. Pun Gun, supra.* We have reasoned that a witness, having the necessary qualifications may give his opinion on the value of the property. "[T]he factors considered and the extent of knowledge and reasoning of an otherwise qualified appraiser are matters which go to the weight rather than the competence of his testimony." *State v. Heirs of Kapahi, supra,* 48 Haw. at 114, 395 P.2d at 940.

In the case before us, Mr. Lum clearly stated in his testimony that the properties which he was presenting were not "comparable properties" because they did not resemble

the condemned property, and that such sales were not being offered as substantive evidence of the value of the property. Mr. Lum testified that the sales were being used as "data properties" to support his opinion of value. In view of this, and in view of the trial court's limiting instruction number 8, we think the jury was sufficiently apprised that the sales were not to be taken as substantive evidence of the fair market value of the property but merely as support for Mr. Lum's opinion on the fair market value.

We find no clear abuse of discretion in the trial court's admission of the sales presented by appellee's appraiser.

Judgment affirmed.

*Melvin Y. Nishimoto*, Deputy Attorney General, for plaintiff-appellant.

*Jack Halpin (Carlsmith, Carlsmith, Wichman and Case* of counsel) for defendant-appellee.