17 F.3d 393
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Benjamin BOLLAG, Plaintiff-Appellee-Cross-Appellant
v.
ENVIRONS LIMITED PARTNERSHIP, a Delaware Limited
Partnership; Environs Management Corporation, a
Delaware Corporation,
Defendants-Appellants-Cross-Appellees.
 Nos. 92-15892, 92-15951.
 United States Court of Appeals, Ninth Circuit.
 Submitted Jan. 11, 1994.
Decided Feb. 1, 1994.
 
 Before: CHOY, SCHROEDER, and NOONAN, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 This appeal arises from a judgment of the district court, sitting with diversity jurisdiction, finding the breach of a land sale contract, and awarding damages under that contract.
 
 
 3
 In February of 1989, Environs Limited Partnership ("Environs") contracted to sell, and Benjamin Bollag ("Bollag") contracted to buy a piece of real property located on the island of Kauai, in the State of Hawaii ("the Environs Property"). The contract was in the form of a "Deposit Receipt, Offer and Acceptance" ("DROA").
 
 
 4
 The dispute revolves around a boundary adjustment which was made by Environs pursuant to an agreement with the adjacent neighboring landowners (hereinafter collectively referred to as "the Stanyers"). Due to a past surveyor's error, a neighboring house and roped fenced backyard owned by Martha Stanyer encroached onto the Environs Property. The boundary adjustment effectively exchanged two triangular parcels of real estate. The parcel given up by the Stanyers consisted entirely of overgrown slope on the south side of Kilauea Stream. The property given up by Environs was similar, except that it also consisted of approximately 3000 square feet of flat, usable land at the top of the slope, where the Stanyer encroachment was located. The only access to this land was either via the steep slope, or over the Stanyer property.
 
 
 5
 The DROA described the property as it existed before the boundary adjustment. Nothing regarding the boundary adjustment was ever disclosed in writing until Environs' agent Michael Dyer ("Dyer") informed the escrow company and Bollag's agent of the proposed boundary adjustment on May 5, 1989. At that time, Bollag objected and demanded that Environs withdraw authorization to proceed with the boundary adjustment. At first, Environs agreed and withdrew its initial authorization. However, upon being informed by the Stanyers' attorney that the Stanyers claimed they had a binding contract to adjust the boundary, Environs went through with the adjustment. As a result of the adjustment, the Environs Property was redesignated from lot 8-W-9-A to lot 8-W-9-A-1.
 
 
 6
 Despite the boundary adjustment, Environs and Bollag completed the contract, with Bollag accepting the adjusted lot, 8-W-9-A-1, reserving his right to sue for damages. Consequently, on March 24, 1992, this case was heard before the District Court of Hawaii in a jury-waived trial.
 
 
 7
 The court found that neither Environs nor its agent Dyer ever disclosed the boundary adjustment to Bollag before entering into the contract to sell the land. It also found that Environs had no binding contract to go through with the boundary adjustment with the Stanyers. The court then found that Environs entered into a subsequent agreement with Bollag to withdraw authorization of the boundary adjustment, in exchange for Bollag accepting the property despite a defect caused by the Stanyer encroachment. The court held that by going through with the boundary adjustment, and tendering the deed to lot 8-W-9-A-1, rather than lot 8-W-9-A, Environs breached both the DROA and the subsequent agreement not to adjust the boundary. Finally, the court found that the breach damaged Bollag by $86,750.60, which was the low estimate given by Bollag's expert appraiser as to the value lost by the adjustment. Bollag's expert based his estimates upon the "abutter approach," which recognizes that properties can have a particular or unique value to an abutting landowner. The figure that the court accepted for damages reflected the amount that it would cost to move the Stanyer house so that it no longer encroached on the Environs Property.
 
 
 8
 Environs has timely appealed the district court's judgment and the amount of damages awarded. Bollag filed a cross-appeal, alleging that the court was correct in finding for the plaintiff, but claiming that the amount of damages awarded were too low.
 
 II. DISCUSSION
 
 9
 Environs' first claim is that Bollag had notice, both actual and constructive, that Environs did not intend to sell the Stanyer property, and that a boundary adjustment was pending. The district court's findings of fact are reviewed under a clearly erroneous standard. Fed.R.Civ.P. 52(a). Questions of law are reviewed de novo. However, "[w]here state law is to be applied, this court will not overrule the district court's interpretation of state law unless it is clearly wrong, particularly when the highest state court has not passed on the matter." Ryan v. Foster & Marshall, Inc., 556 F.2d 460, 465 (9th Cir.1977).
 
 
 10
 Environs claims that because Environ's agent Dyer mentioned the encroachment to Bollag's agent Blachowiak, and stated that it was "imminently being rectified," this constituted knowledge of the boundary adjustment. Environs also claims that due to Stanyer's possession of the house and landscaped yard, Bollag had constructive notice of the encroachment, as well as the pending boundary dispute.
 
 
 11
 Environs is correct that under Waterhouse Trust Co. v. Freitas, 33 Haw. 139 (1934), Bollag would be charged with notice of a open and visible encroachment, such as the Stanyer property. However, Environs misinterprets Hawaii law when he asserts that knowledge of the encroachment leads to inquiry knowledge of the underlying boundary dispute.
 
 
 12
 Environs cites numerous cases for the proposition that possession of property constitutes notice of both actual and legal interests held in the land. However, all of the cases cited are inapposite to the situation at hand. In the cases cited by Environs, the dispute was between a purchaser of land and the possessor of the land who was claiming that the purchaser should be charged with constructive or inquiry notice of the extent of the possessor's legal interests. See e.g., Calhao v. Santo Antonio Soc., 26 Haw. 342, 349 (1922); Yee Hop v. Young Sak Cho, 25 Haw. 494, 505 (1920); Maule v. Waihee Sugar Co., 4 Haw. 637 (1883). None of these cases imply that such constructive knowledge can be used by the seller of the land as a defense against the purchaser in a breach of contract action.
 
 
 13
 This reveals the basic flaw in Environ's argument regarding Bollag's notice of the pending boundary adjustment. Constructive knowledge of any contract between Environs and the Stanyers, under the cases cited by Environs, provides protection to the Stanyers, not to Environs. The cases that Environs cites are addressing the purchaser's status as a good faith or bona fide purchaser under recording acts and the common law, not the effect of constructive notice upon two parties' rights under a contract.
 
 
 14
 The only case that Environs cites that supports the assertion that a purchaser is charged with constructive notice of potential defects in marketable title is Waterhouse Trust Co. v. Freitas, 33 Haw. 139 (1934). In that case, the Hawaii court held that the existence of an easement and water rights to a stream reserved to the territorial government of Hawaii did not breach any covenants of title:
 
 
 15
 The modern rule is that the parties, in the absence of anything to the contrary, are presumed to have contracted with reference to the existing state and condition of the property and if an easement to which it is subject be open and visible and of a continuous character the purchaser is supposed to have been willing to take the property as it was at the time, subject to such burden.
 
 
 16
 Id. at 146. While this language supports an argument that Bollag would be presumed to have contracted to take the property subject to an open and visible encroachment such as the Stanyer house, it in no way supports the argument that a further inquiry regarding any underlying agreement concerning that encroachment and its possible rectification was necessary.
 
 
 17
 In addition, the rule ennunciated in Waterhouse Trust Co. has since been modified, indicating that purchasers of land have no duty to inquire into that which is not either obvious or specifically pointed out to them by the purchasers. In Clarke v. Title Guarantee Co. of Hawaii, 44 Haw. 261, 353 P.2d 1002 (1960), the Hawaii Supreme Court refused to charge a purchaser with knowledge of a visible easement and the encroachment of the structure being purchased onto the street. In that case, the sellers relied on Waterhouse Trust Co., to argue that because an easement and an encroachment were visible, the purchasers must be presumed to have knowledge of their existence. The court rejected this argument, partly because "[n]either sellers nor their brokers mentioned a word about the discrepancy in the description of the land area and the building and garage encroachments." Clarke, 44 Haw. at 266, 353 P.2d at 1005. The court went on to hold that the visibility of the easement did not affect the fact that they breached the covenant of merchantability:
 
 
 18
 "Nor does the fact, as claimed, that the plaintiff viewed and inspected the premises, and had the lot pointed out to him, preclude him from complaining of a defect in quantity. A vendor cannot escape responsibility by showing that the purchaser might have ascertained that such representations were untrue. Dimensions of land cannot be seen with the eye at a glance, and can only be ascertained with accuracy by scientific measurement. One dealing with an owner of real property may, therefore, assume that the owner knows the true boundaries, and he may rely upon representations to that extent."
 
 
 19
 44 Haw. at 268, 353 P.2d at 1006, quoting Harder v. Lang Realty Co., 61 Cal.App. 394, 214 P. 1017 (1923). Just as dimensions of land cannot be seen by the eye at a glance, boundary adjustments are legal maneuvers that are impossible to be seen, and must be either disclosed by the vendor, or discovered by the purchaser via inquiry. Just as in Clarke where there was no duty to inquire about whether the structures encroached on the neighboring right of ways, Bollag was not obligated to inquire about how the encroachment was being rectified. Rather, the parties "are presumed to have contracted with reference to the existing state and condition of the property," Waterhouse Trust Co., 33 Haw. at 146, that is with an encroachment, but no boundary adjustment.
 
 
 20
 Furthermore, rather than Bollag having a duty to inquire of the legal nature of any agreement involving the visible encroachment, Environs had a duty to disclose the boundary adjustment. The district court found that Environs had an obligation to disclose the pending boundary adjustment in writing at the time the contract was entered into. Chapter 467 of the Hawaii Revised Statutes ("H.R.S.") addresses the licensing and conduct of real estate brokers and salesmen. Section 16-99-3(c) and (g) of the rules and regulations of the Real Estate Commission promulgated under H.R.S. Chapter 467 require that the agent "ascertain and disclose all pertinent facts ..." and that the exact agreements regarding real estate transaction be in writing. Therefore, if the boundary adjustment was intended as part of the contract, it had to be in writing.
 
 
 21
 The court was not clearly wrong in finding that the real estate agent's remark regarding the rectification of the encroachment did not constitute notice of the boundary adjustment, as the agent had a duty to disclose the adjustment, and if it was meant to be part of the contract, it had to be in writing. Where there is a failure to disclose a material fact where a duty to disclose exists, that silence creates an estoppel. Peabody v. Damon, 16 Haw. 447, 455 (1905). Here, Environs' agent had a statutory and common law duty to disclose the boundary adjustment, but remained silent. Because Environs is bound by the act of its agent, it is estopped from now claiming that Bollag had a duty to inquire, or that the adjustment was part of the contract.[1]
 
 
 22
 Environs next asserts that relief should be granted based on the fact that Environs made a unilateral mistake in identifying the wrong parcel of land, by identifying the lot number before the boundary adjustment (8-W-9-A), rather than the lot number assigned the property after the boundary adjustment (8-W-9-A-1), and because they had no intention to include the Stanyer property in the sale. This argument also fails under Hawaii law.
 
 
 23
 The district court judge relied upon the Restatement of Contracts 2d Sec. 153 in holding that the facts did not present a basis for the application of relief based on a unilateral mistake. In First Trust Co. of Hilo, Ltd. v. Reinhardt, 3 Haw.App. 589, 592-94, 655 P.2d 891, 894 (1982) the Hawaii Court of Appeals utilized Restatement of Contracts 2d Secs. 153 and 154 in determining that a contract to purchase land was not voidable based on a mistake as to its potential use and value. Under Restatement of Contracts 2d Sec. 153, a unilateral mistake renders a contract voidable only if the other party had reason to know of the mistake, or if the effect of the mistake was to render the contract unconscionable. In the case at bar, the district court found that because Environs did not notify Bollag of the boundary adjustment until after the contract was made, Bollag did not have reason to know of the mistake. Nor was the contract as written unconscionable, so the district court found the doctrine of unilateral mistake inapplicable.
 
 
 24
 Environ's argument that Bollag did have reason to know of the mistake is a rehash of their prior argument that Bollag had constructive or inquiry notice of the boundary adjustment. Because Bollag had no such constructive or inquiry notice under Hawaii law, Bollag had no reason to know of that Environs mistakenly described the wrong parcel of land in the contract.
 
 
 25
 In addition, Environs' mistake was not merely designating the parcel to be sold with the wrong lot number. Rather, Environs' real mistake was the failure to disclose the pending boundary adjustment to Bollag. According to the Restatements of Contracts Sec. 153, unilateral mistake only renders that contract voidable by a party "if he does not bear the risk of mistake under the rule stated in Sec. 154." Under Sec. 154, he bears the risk if it is allocated to him by agreement, by the court, or if he knows he has insufficient knowledge. Here, the law has already allocated the duty to disclose to the seller's agent. In addition, the contract required disclosure of all material facts. Therefore, Stanyer bore the risk, and his failure was not excusable.
 
 
 26
 The next issue raised by the parties is whether or not there was a binding agreement between Environs and the Stanyers to adjust the boundary prior to Environs contracting with Bollag to sell the property. The district court found that there was no such agreement. We find it unnecessary to address this point, because even if there was a binding contract to adjust the boundary, it would have no effect upon Environs liability in damages for its breach of contract with Bollag, and therefore would be a harmless error. "A person may contract to sell land which he does not own." Barkhorn v. Adlib Assoc., Inc., 222 F.Supp. 339, 341 (D.Haw.1963), aff'd 409 F.2d 843 (9th Cir.1969). Once Environs entered a binding contract to sell the land, it had a duty to sell the land described in the contract, despite any other duties it might have owed regarding the same land to the Stanyers.[2]
 
 
 27
 Next, Environs claims that the district court erred in finding that there was a separate binding agreement between Environs and Bollag in which Environs agreed to leave the boundary as it was in return for Bollag's waiver of the title defect created by the encroachment of the Stanyer house. We need not reach this contention, because we find that the boundary adjustment breached the DROA. Whether Environs breached one contract or two separate contracts, the result is the same.
 
 
 28
 Environs' final contention is that the district court erred when it based the amount of damages awarded on what a reasonable encroaching landowner in the Stanyers' position would pay to avoid having to move their house. In its Conclusions of Law, the district court found that the "plaintiff was damaged in the amount of $86,725.60, the exact amount of the bid to move the Stanyer house." The district court's reasoning is further illuminated in its findings of fact, where it stated:
 
 
 29
 Under the abutter approach, a portion of the value of the parcel given up lies in the fact that the Stanyer house was constructed so that approximately half of the structure sat over the property line, on the parcel given up, and the Court finds that a reasonable person in the position of the owners of the Stanyer house would pay an amount at least equal to the alternative cost of remedying the encroachment, which would be the $86,725.60 cost of moving the Stanyer house back from the original property line.
 
 
 30
 While a district court's computation of the amount of a damage award is a finding of fact, reviewed for clear error, Stephens v. City of Vista, 994 F.2d 650, 655 (9th Cir.1993), "[w]hen a legal determination such as the proper elements of an award of damages is reviewed, a de novo standard is applied." In re Air Crash Disaster Near Cerritos, Cal., 982 F.2d 1271, 1275 (9th Cir.1992). In this case, whether it was proper to use the "abutter approach", that is the determination of market value of the land based on the fact that the property has a unique value to an abutting landowner, goes to the proper elements of the award of damages, so it is reviewed de novo.
 
 
 31
 Both Bollag and Environs agree that the proper measure of damages when the seller conveys less land than he agreed to convey in the sale contract is the difference between the fair market value of the land the seller contracted to convey, and the fair market value of the land conveyed. The issue disputed by the parties is whether or not the use by the district court of the "abutter approach" was a finding as to the market value of the property that Environs contracted to convey.
 
 
 32
 The district court's Findings of Facts and Conclusions of Law support Bollag's contention that the court merely used the abutter approach to measure fair market value. Findings of Fact 35-42, referring to the different appraisal experts' testimony, all frame the testimony in terms of effect on the market value of the property. Therefore, the abutter approach apparently was used to determine the market value of the property the contract specified, to be compared with the market value of the property sold.
 
 
 33
 Environs also contends that the damage award was erroneous because it reflected consequential damages, in so far as it reflected that Bollag "could have extorted money out of Stanyer by threatening to sue her or force her to move her house." We reject this argument because we find that the district court based the damages on the difference in the market value of the land, which only indirectly reflected what Bollag could have gotten from the Stanyers.
 
 
 34
 Finally, Environs contends that the use of this approach is erroneous, because it is too speculative. Under Hawaii law, in an action for breach of contract, "[t]he extent of plaintiff's loss must be shown with reasonable certainty and that excludes any showing or conclusion founded upon mere speculation or guess." Ferreira v. Honolulu Star-Bulletin, 44 Haw. 567, 576, 356 P.2d 651, 656 (1960) quoted in Uyemura v. Wick, 57 Haw 102, 111, 551 P.2d 171, 177 (1976) (applying the reasonable certainty requirement for contract damages to the real property contract situation). The district court relied on an appraisal using an abutter approach, which resulted in its determination of damages as being the amount of the bid to move the Stanyer's house. This reflects the determination that the land in question has unique value to the abutting land owner, thus increasing its market value.
 
 
 35
 According to Environs, not only does this approach involve speculation as to what the "reasonable abutting owner" would pay, but it also is speculative as to whether a reasonable owner would actually purchase the property, or whether an encroaching owner would be made to move his house in litigation. However, at least in the area of eminent domain, Hawaii's courts are fairly liberal as to what evidence should be considered in determining fair market value.
 
 
 36
 Any evidence which will aid the jury in fixing the fair market value of the property should be considered by them. Any competent evidence of matter, not merely speculative, which would be considered by a prospective vendor or purchaser or which tend to enhance or appreciate the value of the property taken is admissible.... In this jurisdiction, we have taken a liberal view toward the admission of evidence used to support an expert's opinion as to fair market value.
 
 
 37
 State v. Kunimoto, 62 Haw. 502, 507, 617 P.2d 93, 97-98 (1980). See also State v. Pioneer Mills Co., Ltd., 64 Haw. 168, 177, 637 P.2d 1131, 1137-38 (1981) (finding evidence of the probability of a future redesignation of property for other than agricultural or single family resident use admissible for determination of value in eminent domain proceedings). These cases indicate that Hawaii's courts use a liberal standard in assessing what methods of determining fair market value are acceptable.
 
 
 38
 Moreover, the district court judge heard appraisal evidence reflecting a broad range of market values for the land in question, and judged this evidence to be the most credible and reliable. Since this is an area of law where the Hawaii Supreme Court has never held one way or the other as to whether using the abutter approach is proper, we refrain from disturbing the district court's determination of proper damages under Hawaii law.
 
 
 39
 Bollag cross-appeals the district court judgment, claiming that while the district court did not err in utilizing the abutter approach, it did err in not including the additional value of the parcel associated with the view of the Kilauea Valley which could be seen from the parcel in question. Therefore, they claim the damages should be increased to $325,000.
 
 
 40
 Bollag's proposed valuation is based on using the property for a residential structure taking advantage of the view. He claims that the district court erred in not taking into account this "best and highest use." While industry practice and Hawaii law does value land at its best and highest use, "[w]here there is conflict as to the highest and best use of the property, the question is properly one left to the jury." State v. Dillingham Corp., 60 Haw. 393, 408, 591 P.2d 1049, 1058 (1979). In this case, the district court judge was the finder of fact, and determined that the "plaintiff's other evidence with regard to the value of the property if plaintiff could have gotten access to build a luxury home by building a road or by other means [was] too speculative and uncertain and based on numerous possibilities." Since this is a finding of fact, it is reviewed for clear error. There was adequate evidence upon which to base this finding, and it is not clearly erroneous.
 
 
 41
 Bollag requests attorney's fees and costs for this appeal. Attorney's fees are requested pursuant to Circuit Rule 28-2.3, which states that any party seeking attorney's fees for an appeal must "include a short statement to that effect and must identify the authority under which the attorneys fees will be sought." 9th Cir.R. 28-2.3. Bollag's request for attorney's fees must be denied, because relevant authority precludes the award of additional attorney's fees.
 
 
 42
 "State law governs whether there should be an award of attorney's fees in diversity actions." Hancock Lab., Inc. v. Admiral Ins. Co., 777 F.2d 520, 525 (9th Cir.1985). H.R.S. Sec. 607-17 provides that for actions on a contract, where the contract provides for attorney's fees, "not more than twenty-five per cent shall be allowed." Haw.Rev.Stat. Sec. 607-17 (repealed 1993). In Hawaiian Trust Co. v. Cowan, 4 Haw.App. 166, 173, 663 P.2d 634, 638 (1983), the Intermediate Court of Appeals of Hawaii interpreted H.R.S. Sec. 607-17 as "placing a ceiling on the award of attorney's fees of twenty-five per cent of the judgment amount, exclusive of costs and attorney's fees, or the amount claimed plus interest, but not to exceed what is deemed reasonable by the court." In other words, the statute allows for up to twenty-five percent of the judgment if the plaintiff prevails, and twenty five percent of the amount claimed if the defendant prevails. Blackburn v. Goettel-Blanton, 898 F.2d 95, 98 (9th Cir.1990).
 
 
 43
 Bollag has already been awarded attorney's fees reflecting twenty-five per cent of the judgment award by the district court. To allow for additional attorney's fees for the appeal would be contrary to the statute. "Because an award of attorney's fees is in derogation of common law, a statute allowing an award of attorney's fees is strictly construed." Thornley v. Sanchez, 857 P.2d 601, 608 (Hawaii App.1993). H.R.S. Sec. 607-17 should be strictly construed as capping all attorney's fees awarded, including those generated by an appeal. Therefore, we deny Bollag's request for additional attorney's fees.
 
 
 44
 Bollag also requests costs for the appeal, presumably pursuant to Federal Rule of Appellate Procedure 39, which allows for costs for the appellee if the judgment is affirmed. However, in this case, Appellee Bollag also cross-appealed the amount of damages awarded. Because we affirm the district court's damages award, neither party has entirely prevailed. Therefore, each party shall bear their own costs.
 
 
 45
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as
 
 
 [1]
 Even if Bollag did have a duty to inquire into the possibility of the boundary adjustment, he arguably fulfilled such duty. The DROA included a provision requiring a property disclosure statement from Environs within 10 days of acceptance of the offer. The disclosure statement specifically asks about pending changes and encroachments. Environs returned this form unsigned and lined through, thereby again failing to disclose what it had a contractual duty to disclose
 
 
 [2]
 Environs appears to find the existence of a binding contract with the Stanyers significant based upon their contention that Bollag would be charged with knowledge of such a contract. Again, this is based upon the erroneous conclusion that the seller can rely on the constructive or inquiry notice in a breach of contract claim. As discussed above, no such inquiry duty between a seller and purchaser exists. Therefore, the existence of a binding contract between Environs and the Stanyers to adjust the boundaries is irrelevant as to Bollag's breach of contract claim against Environs