FARRANT CHUNG, et al., Plaintiffs-Appellees, *v.* KAONOHI CENTER COMPANY, a Hawaiian General Partnership, et al., Defendants-Appellants, and HAWAII SHOPPING CENTER CORPORATION, a Hawaiian corporation, et al., Defendants

NO. 6190

OCTOBER 8, 1980

RICHARDSON, C.J., OGATA AND MENOR, JJ., AND CIRCUIT JUDGE CHANG IN PLACE OF KOBAYASHI, J., DISQUALIFIED*

---

* Justice Kidwell, who heard oral argument in this case, retired from the court on February 28, 1979. HRS § 602-10 (1979 Supp.) provides: "After oral argument of a case, if a vacancy arises or if for any other reason a justice is unable to continue on the case, the case may be decided or disposed of upon the concurrence of any three members of the court without filling the vacancy or the place of such justice."

OPINION OF THE COURT BY RICHARDSON, C.J.

This case arises out of a contract to lease concession space for a fast-food Chinese kitchen in the Pearlridge Mall. Plaintiffs-appellees, Farrant Chung, Jordon Y. S. Lum, and J & C Company, a partnership consisting of Chung and Lum, brought a successful breach of contract action in the circuit court of the first circuit against defendants-appellants, Kaonohi Center Company, a Hawaii general partnership, Sheldon M. Gordon and E. Phillip Lyon, individual general partners, and Pearlridge Mall-joint venture 315068, Ed Brennan, Sheldon M. Gordon, E. Phillip Lyon, John Fujieki, and Northwestern Mutual Life Insurance Company, a Wisconsin corporation, partners and joint venturers.[1] We affirm.

In September, 1971, plaintiffs negotiated with William Prosser, defendants' agent, for a ten-year lease on a Chinese fast-food outlet as one component of an international kitchen to be constructed by defendants at the Pearlridge Mall. At that time, plaintiff Chung was a stockbroker and plaintiff Lum owned and operated the House of Dragon, a Chinese restaurant in the Pearl City Shopping Center.[2]

As a result of the negotiations, a contract to lease the Chinese kitchen was executed on January 17, 1972. On January 20, 1972, plaintiffs paid defendants a $1,666 deposit

---

[1] Hawaii Shopping Center Corporation (a Hawaii corporation) and William Prosser were also defendants below. Since they were indemnified by the other defendants, they are not parties to the appeal.

[2] Prior to September 1971, plaintiff Lum also signed a lease with defendants to open another Chinese restaurant, the House of Pearl, at Pearlridge Mall. That restaurant opened in October 1972.

on the lease.[3] In anticipation of operating the Chinese kitchen, plaintiffs arranged for financing, ordered equipment and furnishings, hired chefs and workers, advertised in the yellow pages of the telephone book for the to-be-built kitchen, and incurred other expenses.

Plaintiffs were in frequent contact with defendants after the lease was signed and the record shows voluminous correspondence between the parties concerning the design and operation of the fast-food Chinese kitchen. Whenever plaintiffs inquired about an opening date, they were told to be patient and were assured that they would be notified as soon as a firm date was set. During this period, defendants were negotiating with other parties about leasing the Chinese kitchen. Defendants had given a right of first refusal to a Ms. Liza Chong and were also negotiating with a Mr. Sergio Battistetti, whose partnership eventually obtained the lease on the entire international kitchen operation. Plaintiffs were never informed of these other negotiations. In fact, when confronted with a newspaper article naming Battistetti as the lessee of the international kitchen, Prosser denied the report.

In early June 1973, Prosser sent a letter to plaintiffs informing them that the landlords of Pearlridge Shopping Center had decided not to pursue plaintiffs' lease of the Chinese kitchen. A check for $1,666, the amount of plaintiffs' deposit, was enclosed.

In the trial court, plaintiffs sought specific performance of the lease agreement, contract damages including damages for emotional distress and loss of future profits, and punitive damages for fraudulent, malicious and intentional misrepresentation and acts. The trial judge denied plaintiffs' request for an instruction on punitive damages,[4] but allowed instructions on damages for emotional distress and lost profits. The jury returned a special verdict awarding $50,000 for emo-

---

[3] A formal lease between the parties may have been entered into. However, the document in evidence is not signed by either party. In any event, the jury below found that defendants breached their contract to enter into a lease.

[4] On appeal, the ruling on punitive damages is not challenged by plaintiffs.

tional distress and $175,000 for lost profits. Defendants then moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. The motion was denied and this appeal followed.

On appeal, appellants do not challenge the jury's finding with respect to liability. With one exception, this appeal is premised entirely upon the jury's award of $225,000 in contract damages. The issues which appellants raise and the order in which they will be discussed are:

I. Whether the trial court erred in denying defendants' motion for a mistrial, which was based upon testimony by plaintiff Lum that his wife had suffered miscarriages as a result of the contract breach.

II. Whether the trial court erred in giving a jury instruction allowing damages for emotional distress for breach of a commercial contract.

III. Whether the trial court erred in giving a jury instruction allowing damages for loss of anticipated profits in an unestablished business.

IV. Whether the trial court erred in submitting to the jury a special verdict form, which contained spaces for damages for emotional distress and lost profits.

## I. MOTION FOR MISTRIAL.

We first consider appellants' contention that a mistrial should have been declared because of certain testimony by plaintiff Lum. The testimony was as follows:

Q. [By Mr. Kim, plaintiffs' attorney]: Now, how about your wife? How your wife feel this time?

A. My wife?

Q. Uh-huh.

A. That time she worry too much and she also scold me, too. "Why they do that? You do anything wrong?" She asked me. So my wife, I think, two times miscarry. She go operation hospital last year. They cancel my lease.

MR. KIEFER [defendants' attorney]: Your Honor, I'm honestly going to have to move to strike that. This

man can't give a medical opinion as to the cause of the miscarriage.

THE COURT: Objection sustained. Motion granted. Jury is instructed to disregard the last statement made by the witness.

Appellants argue that Mr. Lum's testimony was so inflammatory that the instruction to disregard it could not cure its detrimental effect.

When a court has admonished a jury to disregard an improper statement, the ordinary presumption is that the jury will do so. *State v. Cavness*, 46 Haw. 470, 473, 381 P.2d 685, 686-87 (1963); *State v. Lenox*, 250 Ind. 482, 237 N.E.2d 248 (1968). *See also Territory v. Goto*, 27 Haw. 65, 97 (1923); *Saiki v. Lee Sing*, 27 Haw. 399, 414 (1923); *Oltmans v. Orthopaedic and Fracture Clinic, P.A.*, ___ Minn. ___, 278 N.W.2d 538 (1979); *Apodaca v. Miller*, 79 N.M. 160, 441 P.2d 200 (1968). However, this court has held that when improper testimony is prejudicial to the opposing party, the ordinary presumption prevails "only if there is a reasonable certainty that the impression upon the jury could be or was dispelled by the court's admonition." *Young v. Price*, 48 Haw. 22, 27, 395 P.2d 365, 368 (1964). *See also Territory v. Corum*, 34 Haw. 167, 184-85 (1937). Appellants contend that the facts of this case are similar to those of *Young v. Price* and that the trial court should have granted their motion for mistrial. We disagree.

In *Young v. Price*, plaintiff sought damages for a broken arm suffered in a fall after tripping over a hose at defendant's construction site. At trial, plaintiff testified about numerous other ailments, including a heart attack and gall bladder operation. The trial court reserved ruling on motions to strike such testimony since plaintiff's attorney represented that he would show a causal connection between the injury sustained by defendant's alleged negligence and these various other ailments. At the close of plaintiff's case, counsel had failed to show a causal connection, the motions to strike were granted, and the jury was admonished to disregard plaintiff's irrelevant testimony. On appeal, this court found that plaintiff's testimony was so vivid and of such a nature that it could not have helped but arouse sympathy in the mind of an ordinary

person and make a strong impression on the jury. Under those circumstances, we held that striking the improper testimony at the close of plaintiff's case could not cure the error, and reversed and remanded for a new trial. In the instant case, however, plaintiff made one isolated statement, his testimony was immediately stricken, and the jury was instructed to disregard it. Unlike *Young v. Price*, there was not a series of improper statements throughout the trial, nor was the improper testimony allowed to stand, thereby permitting emotional and irrelevant testimony to influence the jury. We feel that in this case there is more than a reasonable certainty that the trial court's prompt admonition to the jury dispelled any prejudicial effect that may have been created by Mr. Lum's testimony.[5]

## II. DAMAGES FOR EMOTIONAL DISTRESS AND DISAPPOINTMENT.

Appellants next argue that the trial court erred in giving Plaintiffs' Instruction No. 11, which read:

If you find in favor of the plaintiffs, plaintiffs have a right to recover all damages which they have suffered and which the defendants or a reasonable person in the defendants' position should have forseen would result from their acts or omissions. Such damages may include reasonable compensation for emotional distress and disappointment, if any, which plaintiffs have suffered as a proximate result of the defendants' conduct. There is no precise standard by which to place a monetary value on emotional distress and disappointment, nor is the opinion of any witness required to fix a reasonable amount. In making an award of damages for emotional distress and disappointment, you should determine an amount which your own experience and reason indicates would be sufficient in light of all of the evidence.

---

[5] Appellees raise the question of whether defendants-appellants' motion for a mistrial, which was made after both sides had presented their evidence, was timely. Since we conclude that the motion was correctly denied, we do not reach the timeliness issue.

In the trial court, appellants objected to the instruction on the grounds that "such emotional distress is recoverable only under special circumstances and not in an ordinary commercial contract such as we have here today." Appellants also urged this same contention in the briefs filed on appeal. However, at oral argument and in response to an inquiry from the court, appellants argued alternatively that even if damages for emotional distress could have been awarded, the instruction was defective because it was incomplete. We deal initially with the issue of whether damages for emotional distress and disappointment can be awarded for breach of a commercial contract, and then discuss the jury instruction.

The seminal case in this jurisdiction on damages for emotional distress and disappointment arising from breach of a contract is *Dold v. Outrigger Hotel*, 54 Haw. 18, 501 P.2d 368 (1972). In Dold, plaintiffs, who were visitors from the mainland, had booked hotel accommodations at the Outrigger Hotel. Upon arriving at the hotel, plaintiffs were refused accommodations and transferred to another hotel of lesser quality because the Outrigger lacked available space. We upheld a jury instruction allowing damages for emotional distress and disappointment, stating that "where a contract is breached in a wanton or reckless manner as to result in a tortious injury, the aggrieved person is entitled to recover in tort." 54 Haw. at 22, 501 P.2d at 372.

Appellants urge us to adopt a rule limiting the holding of *Dold* to "personal" contracts such as contracts of marriage, contracts of burial, and contracts to deliver personal messages. They argue that under traditional contract law, damages are allowable only for those injuries which are reasonably foreseeable at the time the contract was made. Since the primary objective of a "personal" contract is that of comfort, happiness, or well-being, emotional distress is a foreseeable injury which could result from a contract breach. Appellants reason that, unlike a personal contract, a commercial contract has as its primary objective financial gain and it is not reasonably foreseeable that the breach of such a contract could cause emotional distress and disappointment.

In several recent cases, *see Island Holidays, Inc. v. Fitzgerald*, 58 Haw. 552, 574 P.2d 884 (1978); *Uyemura v. Wick*, 57 Haw. 102, 551 P.2d. 171 (1976), we have implied that damages for emotional distress and disappointment may be recoverable when the relationship between the parties is based on a commercial contract. We now expressly so hold. We do not think that the dispositive factor in allowing damages for emotional distress is the nature of the contract. The dispositive factor is, rather, the wanton or reckless nature of the breach. The basis of our holding in *Dold* was our recognition that "certain situations are so disposed as to present a fusion of the doctrines of tort and contract." 54 Haw. at 22, 501 P.2d at 372.

The facts in this case present an ideal situation for application of the *Dold* rule. Appellants negotiated with three separate parties, including appellees, for the lease of the Chinese kitchen. At the time appellants signed the contract to lease to appellees, they had already given a right of first refusal to Liza Chong. During the year and a half after the contract to lease the kitchen was signed, appellants' agent, William Prosser, made numerous representations to appellees that they had secured the lease. Prosser and Sheldon Gordon, one of the general partners of Kaonohi Center Company, were also well aware of the effort and funds expended by appellees in reliance on the lease and allowed appellees to continue to believe that they had secured the lease. Finally, Prosser flatly denied a newspaper report that the kitchen would be leased to another party. The actions of appellants in this case were reprehensible and clearly amounted to wanton and/or reckless conduct sufficient to give rise to tort liability.

Turning now to the jury instruction itself, we note that in the trial court appellants objected to Plaintiffs' Instruction No. 11 on the specific grounds that damages for emotional distress were not recoverable in a commercial contract situation. On appeal, appellants urged this same contention. Not until oral argument and upon questioning by this court did appellants argue that the instruction was incomplete in that it failed to inform the jury that a wanton or reckless contract breach must be found in order to award emotional distress

damages. At oral argument, appellants also contended that the objection below was broad enough to include within it an objection to the adequacy of the instruction.

HRCP Rule 51(e) provides in part:

> The court shall instruct the jury after the arguments are completed. No party may assign as error the giving or the refusal to give, or the modification of, an instruction . . . unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.

At trial, appellants failed to object to the proposed instruction on the grounds that it was incomplete. An examination of the record shows that plaintiffs had earlier offered and then withdrawn an instruction on wanton or reckless breach. Thus, it is clear that defendants-appellants were or should have been aware at trial that Instruction No. 11 might be incomplete.[6] Appellants neither raised that objection at trial nor in their appellate briefs. We find that appellants failed to state the proper grounds for objection at trial and failed to properly raise the issue on appeal. *See Quality Furniture, Inc. v. Jerry Hay, Inc.*, 61 Haw. 89, 92 n.4, 595 P.2d 1066, 1068 n.4 (1979).

Of course, this court has previously stated that HRCP Rule 51(e) may be construed in a liberal manner. *See Struzik v. City and County of Honolulu*, 50 Haw. 241, 246, 437 P.2d 880, 884 (1968). Under Supreme Court Rule 3(b)(3) we may also notice a plain error even where a party has failed to raise it in their briefs. And we have stated that:

> [E]ven the complete failure to object to a jury instruction does not prevent an appellate court from taking cognizance of the trial court's error if the error is plain and may result in a miscarriage of justice. (Citations omitted).

*Turner v. Willis*, 59 Haw. 319, 324, 582 P.2d 710, 714 (1978). However, we do not believe that the error in this case, if indeed there was error, would result in a miscarriage of justice. As discussed above, our review of the record supports

---

[6] Plaintiffs' Instruction No. 11 is identical to Plaintiffs' Instruction No. 5 in *Dold, supra*, 54 Haw. at 21 n.1, 501 P.2d at 371 n.1. *But cf.* Instructions Nos. 17 and 18 in *Island Holidays, Inc. v. Fitzgerald, supra*, 58 Haw. at 564 n.9, 574 P.2d at 892 n.9.

the conclusion that appellant's actions in this case were wanton and/or reckless.

## III. DAMAGES FOR LOSS OF ANTICIPATED PROFITS.

We turn now to appellants' contention that damages for loss of anticipated profits should not have been allowed. The trial court, over defendants' objection, charged the jury as follows:

> Where the breach of contract consists of repudiating the contract or preventing its performance, the nondefaulting party may recover profits, presumed to have been contemplated by him, reduced to present day value, [that] he would have realized had the contract been fully performed, as is proved by the preponderance of the evidence. The profits which would have been realized had the contract been performed and which have been prevented by its breach are included in the damages recovered where from the express or implied terms of the contract or from the special circumstances under which it was made, it may be readily presumed that they were within the intent and mutual understanding of both parties at the time it was entered into.

Plaintiffs' Instruction No. 9. Appellants argue that, as a matter of law, expected profits from a new or unestablished business are too speculative to warrant recovery. Alternatively, they contend that even if this court should hold such profits recoverable, the proof in this case failed to meet the standard of reasonable certainty.

The general rule with regard to damages in a breach of contract action is that "when one sustains loss by breach of a contract, he is entitled to have just compensation commensurate with his loss." *Ferreira v. Honolulu Star-Bulletin*, 44 Haw. 567, 573-74, 356 P.2d 651, 655 (1960). In *Ferreira*, plaintiff sought damages for loss of profits which would have been realized had defendant, *Honolulu Star-Bulletin*, fulfilled its contract to print an advertisement for an upcoming attraction at plaintiff's theater. We recognized that future profits may be an appropriate element of contract damages,

but found the proof offered in that case insufficient to establish profits with reasonable certainty. We stated:

> [A] distinction is made in the law between the amount of proof required to establish the fact that the injured party has sustained some damage and the measure of proof necessary to enable the jury to determine the amount of damage. It is now generally held that the uncertainty which prevents a recovery is uncertainty as to the fact of damage and not as to its amount. However, the rule that uncertainty as to the amount does not necessarily prevent recovery is not to be interpreted as requiring no proof of the amount of damage. The extent of plaintiff's loss must be shown with reasonable certainty and that excludes any showing or conclusion founded upon mere speculation or guess. (Citations omitted).

44 Haw. at 575-76, 356 P.2d at 656.

While *Ferreira* recognized that lost profits may be awarded in a contract action, we have never ruled directly on whether future profits in an unestablished or new business are allowable. *But see Rainbow Island Productions, Ltd. v. Leong*, 44 Haw. 134 (1960) (where a business is newly established, damages for lost profits caused by interruption of business cannot be shown by mere comparison of volume of business before and after interruption). *See also Benham v. World Airways, Inc.*, 432 F.2d 359 (9th Cir. 1970). Other courts, when faced with this question, have precluded recovery as a matter of law, reasoning that absence of prior income and expense experience renders anticipated profits too speculative to meet the standard of reasonable certainty. *See, e.g., China Doll Restaurant, Inc. v. Schweiger*, 119 Ariz. 315, 580 P.2d 776 (Ct. App. 1978); *Evergreen Amusement Corp. v. Milstead*, 206 Md. 610, 112 A.2d 901 (1955); *Hughes v. Hobson*, 558 P.2d 543 (Nev. 1976).

Recent cases in several jurisdictions, however, have rejected a *per se* rule based upon the classification of a business as new or unestablished and focused instead upon whether a plaintiff can prove lost profits with reasonable certainty. *S. Jon Kreedman & Co. v. Meyers Bros. Parking – Western Corp.*, 58 Cal. App.3d 173, 130 Cal. Rptr. 41 (Ct. App. 1976);

*Vickers v. Wichita State University, Wichita,* 213 Kan. 614, 518 P.2d 512 (1974); *Smith Development Corp. v. Bilow Enterprises, Inc.,* 112 R.I. 203, 308 A.2d 477 (1973); *Wyoming Bancorporation v. Bonham,* 563 P.2d 1382, *reh. den.* 566 P.2d 219 (Wyo. 1977). *See* "Remedies — Lost Profits as Contract Damages for an Unestablished Business: The New Business Rule Becomes Outdated," 56 N.C. L. Rev. 693 (1978). We find the reasoning of this latter line of cases persuasive and reject the harsh rule which forecloses recovery merely because a business is new or unestablished. In our opinion, it would be grossly unfair to deny a plaintiff meaningful recovery for lack of a sufficient "track record" where the plaintiff has been prevented from establishing such a record by defendant's actions. Thus, we hold that where a plaintiff can show future profits in a new or unestablished business with reasonable certainty, damages for loss of such profits may be awarded.

Of course, the evidence necessary to show future profits with reasonable certainty depends on the circumstances of each individual case. While absolute certainty is not required, the court or jury must be guided by some rational standard in making an award for loss of future profits. *Vickers v. Wichita State University, Wichita, supra; Smith Development Corp. v. Bilow Enterprises, Inc., supra.*

We look now at the evidence of future profits in this case to determine whether it met the standard of reasonable certainty. Plaintiffs' key witness on anticipated profits was Don Voronaeff, a real estate and business appraiser. Voronaeff valued the proposed Chinese kitchen using three different valuation approaches — a reproduction cost analysis,[7] a comparative market analysis,[8] and an income stream

---

[7] The cost, based on current prices, of reproducing the assets of the business is determined; this method produced an appraisal of $78,471.

[8] Recently sold businesses of a similar nature are compared by both gross and net income to the subject business to indicate a fair market value; this method produced an appraisal according to gross income of $331,800 and according to net income of $385,365.

analysis.[9] In reaching a final valuation figure, Voronaeff relied primarily on his income stream analysis, but included both the reproduction cost analysis and comparative market analysis as a check on that figure.

While appellants do not challenge the different valuation approaches utilized by Voronaeff, they do challenge the basis for his figures. They particularly focus on his assumptions regarding costs and expenses of plaintiffs' proposed operation. In order to evaluate plaintiffs' evidence, we must examine in some detail Voronaeff's income stream analysis.

An income stream analysis requires that an appraiser have a fairly accurate estimate of the projected net income of the business. The net income is derived by estimating the future gross profits of the business and subtracting the reasonably expectable expenses and cost of goods. The resulting net income is then capitalized at a rate reflecting the risk involved in the operation over an appropriate period of time, in this case over the ten-year life of the lease.

In his analysis, Voranaeff used $420,000 as the gross income for the first year of operation and projected that that figure would increase by ten percent each year.[10] Voronaeff testified that he arrived at this figure by looking at the actual gross income of the Chinese kitchen in the Pearlridge International Kitchen run by Mr. Battistetti. The first year gross income of that operation was $417,000. A person employed by Voronaeff also conducted a one-day count of customers and gross receipts of the existing Chinese kitchen which, when projected over a year, indicated a gross income of $666,041. That survey figure, Voronaeff stated, supported the gross

---

[9] The net income the business will produce over its life is determined and capitalized at a rate reflecting an appropriate rate of return to the investor and the risk involved in the business venture. See discussion in text.

[10] The ten percent per year projected increase was based on Voronaeff's investigation of population and growth studies of the surrounding area which indicated at least a ten percent annual increase in population. Voronaeff testified that with proper management, a business operating in the area should also increase its volume by that percentage.

income figure from the Battistetti operation and, based on Battistetti's gross income and gross income figures from other Chinese restaurants, a $420,000 gross income was reasonable.

Appellants object to the gross income figure utilized by plaintiffs' expert since it was based on an existing operation *not* run by plaintiffs. We reject this argument for obvious reasons. Appellants' contract breach prevented appellees from establishing a profit and loss record on which to base a gross income figure. The restaurant most nearly approximating plaintiffs' proposed kitchen was Battistetti's Chinese kitchen. It was in the identical location and served the same type of food to the same type of clientele as plaintiffs' proposed restaurant. Further, plaintiffs' expert also testified that he considered the gross income from other Chinese restaurants and ran an independent survey of the Battistetti operation as a check on the gross income figure. Under these circumstances, we find no error in allowing Mr. Voronaeff to use $420,000 as the first-year gross income of plaintiffs' proposed business.

The next stage in Voronaeff's analysis was estimating the cost of goods and expenses and subtracting them from the gross income to reach a net income figure. While plaintiffs' expert relied primarily on the Battistetti operation in establishing a gross income figure, he did not use the actual expenses and cost of goods from Battistetti's Chinese kitchen. Instead, he subtracted estimates which he testified were based on industry standards. Voronaeff extensively detailed the cost of goods and other expenses in his testimony and on cross-examination stated that the expenses he had subtracted "covered everything that you should cover in operating a business." Some expenses, he stated, like rent, taxes, insurance, and salaries, were actual, in the sense that they were reasonably fixed. Other expenses, such as cost of goods, were estimates based on Voronaeff's knowledge of the industry and projected rise in prices. After subtracting each expense, Voronaeff derived a net income figure of $67,608 for the first year of operation. He then capitalized that net income figure

at a rate of 20% over the ten-year life of the lease to reach a final value of approximately $225,000.[11]

Appellants argue that Voronaeff's testimony as to cost of goods and expenses was speculative and lacked a factual basis. Thus, they contend, the net income on which Voronaeff based his income stream analysis was highly conjectural and the resulting valuation inaccurate.

It is well established in this jurisdiction that a witness having the necessary qualifications may give an opinion as to the value of property. *State v. Kunimoto*, 62 Haw. 502, 617 P.2d 93 (1980); *State v. Dillingham Corp.*, 60 Haw. 393, 591 P.2d 1049 (1979). In *Dillingham, id.*, we quoted the following from *State v. Heirs of Kapahi*, 48 Haw. 101, 114, 395 P.2d 932, 940 (1964). "The factors considered and the extent of knowledge and reasoning of an otherwise qualified appraiser are matters which go to the weight rather than the competence of his testimony." 60 Haw. at 411, 591 P.2d at 1060. *See also Arkansas State Hwy. Commission v. 1st Pyramid Insurance Co.*, 579 S.W.2d 587, *reh. den.* (Ark. 1979) (expert testimony on value of property in eminent domain proceeding); *Hardwick v. Dravo Equipment Co.*, 279 Or. 619, 569 P.2d 588 (1977) (expert testimony on loss of future profits in breach of contract action by buyer against seller); *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16 (5th Cir.), *cert. dismissed*, 419 U.S. 987 (1974) (expert testimony on lost profits in private anti-trust action).

In the instant case, plaintiffs' expert testified in great detail on estimated expenditures, explaining the amount of money to be spent in each category. These estimates were based on his appraisal experience and his examination of

---

[11] In explaining this method, Voronaeff stated, "What we're saying is that someone would pay $225,000 to obtain an annual net income of $67,000 and they'd be getting a 20 percent return to their investment."

In a separate analysis, Voronaeff also calculated the net income of the restaurant for a ten-year period by projecting an increase of ten percent in both gross income and expenses. He concluded that the total net income would be $1,077,000, which discounted to present-day net value would be $419,000.

other restaurant operations.[12] Once a witness is qualified as an expert appraiser, he or she should be permitted to give an opinion using any of the accepted methods of valuation. Weaknesses in reaching the valuation go to the weight of such testimony. It is incumbent on the opposing party to bring out any such weaknesses on cross-examination or through presentation of counter evidence.

Appellants had sufficient opportunity at trial to bring to the jury's attention any fallacies in Voronaeff's appraisal. Our examination of the record shows that appellants' counsel vigorously cross-examined Voronaeff on his expense and cost assumptions. It was made clear to the jury that some of Voronaeff's cost and expense figures were estimates. Appellants' witness, Sergio Battistetti, a partner in the International Kitchens operation, testified that the existing Chinese fast-food kitchen had lost $13,962 in its first year of operation and was expected to net only $4,042 in its second year of operation. Dr. Lewis Freitas, a business and finance expert testifying for defendants, discredited use of the income stream approach in valuing the proposed business. He stated that that approach "requires that the income that's generated be constant and last for at least 20 or 30 years." Using the actual income and expenses of the existing operation, pro-

---

[12] This case is distinguishable from State v. Davis, 53 Haw. 582, 499 P.2d 663 (1972), in which we disallowed testimony of an expert real estate appraiser that was based on information obtained from an unidentified engineer. We stated "an expert witness may not, however, serve as a mere conduit for the hearsay opinion, the factual basis of which is not established through evidence, of another expert who does not testify *when the expert who does testify lacks the requisite qualifications to render the opinion in his own right.*" (Emphasis added.) 53 Haw. at 589-90, 499 P.2d at 669. In this instance, Voronaeff's opinion was based on his own estimates and knowledge. Of course, the defendants could have asked him to produce evidence of the underlying facts upon which he based his estimates. Although appellants made a running objection to Voronaeff's testimony on hearsay grounds, they did not specifically object on these grounds nor request proof of the underlying facts. In any event, we note that there is a substantial authority for the receipt of expert opinion testimony notwithstanding the fact that the expert's sources of information are not admissible. *Cf.* 3 Weinstein's Evidence ¶ 703 [02] (1978); Hawaii Rules of Evidence, Act 164 (10th Leg. Sess. 1980), Rule 703 and commentary thereto. It is within the discretion of the trial court to disallow expert testimony where it feels the underlying facts or data indicate lack of trustworthiness. *Id.*

jected out over a ten-year period, Freitas set a present value
on the Battistetti operation of between $35,000 and $40,000.
The method by which that valuation was reached was clearly
explained to the jury.[13]

This was not the only information the jury had before it. It
also knew that plaintiff Lum owned and operated two Chinese
restaurants, one of which was located at Pearlridge Mall. The
profit and expense sheets from at least one of these restau-
rants was introduced into evidence, so the jury could rea-
sonably have estimated the effectiveness of plaintiff Lum's
management.[14] The jury might well have concluded that the
fast-food Chinese kitchen under plaintiffs' management
would have been more efficient because of Lum's previous
experience and his ability to share resources with his other
restaurant at Pearlridge.

The jury, as fact-finder, had the responsibility of judging
the credibility of the witnesses, resolving conflicting evidence
and assessing the weight of the expert's testimony. We are of
the opinion that, on the whole, the jury had sufficient data
from which to make a rational judgment as to the loss of future
profits and on which to base its award.

## IV. SPECIAL VERDICT FORM.

Appellants' final contention is that the trial court erred in
submitting to the jury a special verdict form containing blanks

---

[13]Freitas applied a method he termed present value of future cash benefits. Using
the projected net income for each year of the ten-year lease, he discounted each
year's net income at a 20% discount rate to reach a present value, added these
figures together, and then subtracted the initial outlay involved in starting the
business to arrive at the value of the business on its opening date. Since the
restaurant had been in operation for almost 2 years at the time of trial, he added back
in a 20% return for that period.

[14] Appellants introduced the profit and loss sheet from the House of Dragon,
which showed that plaintiff Lum's profits ranged between 4.1% and 11.4% over a 5½
year period. It should be noted that the profit projected by Voronaeff for the fast-food
Chinese kitchen was 15.9%, substantially higher than that realized in the House of
Dragon operation. However, there was testimony to the effect that construction near
the House of Dragon may have had a detrimental effect on business.

to be filled in with dollar amounts for lost profits and emotional distress damages.[15] At trial, appellants' counsel objected to the use of a special verdict form and the wording of this particular form. He argued that a general verdict form should be used and that leaving spaces would give the jury the impression that it was required to fill in the blanks with dollar amounts. The trial judge asked appellants' counsel for suggestions to improve the form, but counsel replied that he had none, that the defect was inherent in a special verdict form.

On appeal, appellants have failed to cite any cases to support their contention, relying instead upon their arguments that neither lost profits nor emotional distress damages should have been allowed. We have fully disposed of those arguments above. Further, we note that the trial court instructed the jury as follows with regard to speculative damages:

> You are not permitted to award a party speculative damages, which means compensation for loss or harm which, although possible, is conjectural or not reasonably certain.

> However, if you determine that a party is entitled to recover, you should compensate him for loss or harm which is reasonably certain to be suffered by him as a proximate result of the injury in question.

---

[15] The special verdict form stated:

### SPECIAL VERDICT

1. Do you find that the Defendants breached their contract to enter into a lease with Plaintiffs for the Chinese Kitchen in the International Kitchens at the Pearlridge Shopping Center?

    Yes_____)   (Check appropriate space)
    No _____)

If your answer to question No. 1 is Yes, please answer question No. 2; otherwise, do not answer question No. 2.

2. We find Plaintiffs are entitled to damages as follows:
    Compensatory or anticipated lost profits    $_____
    Emotional distress    $_____

·It is clear from this instruction that the jury was aware that it could only award damages for reasonably certain harm or loss proximately resulting from the contract breach.

In light of appellants' total failure on appeal to support their claim and the above jury instruction, we find no error.

Affirmed.

*Berton T. Kato (Clyde W. Matsui* on the briefs; *Kobayashi, Watanabe, Sugita & Kawashima,* of counsel) for defendants-appellants.

*Edward Y. N. Kim* for plaintiffs-appellees.

