5 F.3d 539
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 PURE, LTD., a Hawaii corporation
Plaintiff-Counterclaim-Defendant-Appellant,
v.
NATIONAL BEVERAGE CORPORATION, a Delaware corporation,
Defendant-Appellee,
and
Shasta Beverages, Inc., a Delaware corporation,
Defendant-Counterclaim Plaintiff-Appellee.
 No. 92-15144.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 9, 1993.
Decided Sept. 13, 1993.
 
 Appeal from the United States District Court for the District of Hawaii, No. CV-88-00101-ACK; Alan C. Kay, District Judge, Presiding.
 D.Hawaii
 REVERSED.
 Before: SNEED, POOLE, and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Appellant Pure challenges the district court's grant of JNOV, which was based on the lack of essential terms in the marketing and distribution contract between Pure and appellee Shasta. We reverse the JNOV and reinstate the jury's verdict in all respects.
 
 I.
 FACTS AND PRIOR PROCEEDINGS
 
 3
 In 1986 Pure, Ltd., a Hawaii corporation that produces sparkling water, approached Shasta to discuss the possibility of Shasta distributing Pure's product, Pure Hawaiian Sparkling Water (PHSW). Pure and Shasta entered into an agreement on September 19, 1986 (Agreement), in which Shasta agreed to purchase the necessary ingredients for PHSW from Pure, and then bottle, market, and sell PHSW in the continental United States.
 
 
 4
 Shasta and Pure amended the Agreement twice. First they amended it with respect to liability insurance and exclusive dealing with the Addendum Agreement on October 9, 1986. They amended it a second time with the aptly named Amendment No. 2 on February 20, 1987 in an attempt to clarify a dispute over the marketing plan. Amendment No. 2 is discussed more below.
 
 
 5
 The Agreement gave Shasta the right to distribute PHSW throughout the continental United States.[1] It stated that Pure and Shasta would agree on the geographic distribution areas, the minimum distribution for the two year introductory period, and the post-introductory minimum annual sales. The post-introductory quotas were expressly tied to the marketing plan that Shasta was to deliver. Pure had the right to terminate the distributorship if Shasta's performance was consistently below the quota.
 
 
 6
 The Agreement also stated that Shasta would use its best efforts to market PHSW.[2] It required Shasta to deliver a marketing plan for the PHSW within three months, and in this marketing plan Shasta was to use its best efforts and to expend sufficient funds for the promotion of PHSW.
 
 
 7
 In the process of developing a marketing plan, the Shasta vice-president initially in charge of the Pure deal, Horrigan, asked the Shasta director of marketing and sales, Crenshaw, to prepare a preliminary marketing plan for PHSW. Crenshaw proposed a roll out of PHSW in California and Arizona. Shasta rejected Crenshaw's proposal as too risky, not based upon realistic assumptions, and too expensive. Shasta, now under a new management team, instead proposed a test market approach starting in San Diego with broader distribution if the product was successful. Pure rejected this San Diego plan.
 
 
 8
 Pure believes that the new management team was responsible for Shasta's rejection of the Crenshaw plan. Pure argued that the new team was interested in taking over Pure, and disliked the Agreement because it was too favorable to Pure. This new team was headed by Raymond Smith, the chief financial officer for both Shasta and its parent company, National.
 
 
 9
 In the aftermath of the San Diego plan disagreement, Pure and Shasta amended the Agreement with the previously mentioned Amendment No. 2 on February 20, 1987. Under this amendment, Shasta had until April 15, 1987 to deliver a completed marketing plan conforming to the terms of the Agreement. The delay until this date would not constitute a breach of the Agreement provided that Shasta fulfilled all of its obligations. Amendment No. 2 also incorporated the Contract Pack Agreement, in which Shasta agreed to distribute PHSW in Hawaii, into the Agreement.
 
 
 10
 Thereafter, Shasta hired the Ryan Partnership to develop a marketing plan and the Boyd consulting firm to conduct research. The Ryan and Boyd firms presented their results to Shasta and Pure on April 29, 1987. Ryan proposed a broad marketing plan to roll out PHSW in California. Shasta rejected the plan as too risky and expensive. Shasta offered to conduct a initial roll out in Phoenix to be followed by broader distribution. Pure rejected this proposal.
 
 
 11
 Following this rejection, the parties began discussing what it would take to have an all California roll out with large spending levels. The possibility of Shasta acquiring an equity ownership in Pure was mentioned. Shasta sent Pure a proposal under which Shasta would acquire 51% of Pure in exchange for an all California roll out. The parties suggested various proposals, but no agreement was reached.
 
 
 12
 In February of 1988, Pure filed this suit alleging breach of contract and promissory fraud against Shasta and the same plus tortious interference against National, Shasta's parent company. Shasta counter sued for rescission based upon fraud, failure of consideration, mistake, and breach of contract.
 
 
 13
 In May of 1988, Pure signed an agreement with a smaller distributor, Hansen's, to sell PHSW. The product eventually failed.
 
 
 14
 At the trial, Shasta moved for a directed verdict. The district court reserved its decision, and eventually let the case go to the jury. The jury found, by a special verdict, that Pure and Shasta entered into an agreement where there was a meeting of the minds as to all essential terms, that Shasta breached the Agreement, that National was the alter ego of Shasta, that Pure also breached the Agreement, that there was no failure of consideration, mutual mistake, or fraud, and that Pure breached the Contract Pack Agreement. The jury awarded Pure $1.4 million for Shasta's breach of the Agreement and Shasta $353,342 for Pure's breach of the Contract Pack Agreement.
 
 
 15
 Shasta renewed its motion for a directed verdict and moved for a JNOV. The district court granted Shasta's motions finding that the Agreement lacked essential terms and was therefore not an enforceable contract. After several nonsubstantive corrections, the district court entered the JNOV for Shasta and amended the award amount to Shasta for Pure's breach of the Contract Pack Agreement to $306,306. Pure timely appealed.
 
 II.
 JURISDICTION AND STANDARDS OF REVIEW
 
 16
 The district court had jurisdiction pursuant to 28 U.S.C. Sec. 1332(a), and this court has jurisdiction pursuant to 28 U.S.C. Sec. 1291.
 
 
 17
 This court reviews the district court's grant of a JNOV de novo. Erickson v. Pierce County, 960 F.2d 801, 804 (9th Cir.), cert. denied, 113 S.Ct. 815 (1992). A JNOV is only proper where, considering the evidence in the light most favorable to the nonmoving party, the evidence permits only one reasonable conclusion as to the verdict. Venegas v. Wagner, 831 F.2d 1514, 1517 (9th Cir.1987). A JNOV is inappropriate if reasonable minds could disagree about the outcome. Id.
 
 
 18
 An appellate court reviews principles of contract law de novo. Aetna Casualty and Sur. Co. v. Pintlar Corp., 948 F.2d 1507, 1511 (9th Cir.1991). A reviewing court must uphold the jury's finding of the amount of damages unless the amount is based only on speculation or guess work. City of Vernon v. Southern Cal. Edison Co., 955 F.2d 1361, 1371 (9th Cir.), cert. denied, 113 S.Ct. 305 (1992), appeal pending. A determination that a defendant is an alter ego of another is essentially a factual conclusion reviewed for clear error. Wolfe v. United States, 798 F.2d 1241, 1243 n. 2, amended on other grounds, 806 F.2d 1410 (9th Cir.1986), cert. denied, 482 U.S. 927 (1987).
 
 III.
 DISCUSSION
 
 19
 A. The Agreement Was Sufficiently Definite.
 
 
 20
 1. General principles.
 
 
 21
 The construction and legal effect of a contract is a question of law. Clarkin v. Reimann, 638 P.2d 857, 863 (Haw.Ct.App.1981).[3] To be enforceable a contract must be certain and definite as to its essential terms. Boteilho v. Boteilho, 564 P.2d 144, 146 (Haw.1977). The law leans against the destruction of contracts for uncertainty; courts instead favor a determination that an agreement is sufficiently definite. In re Application of Sing Chong Co., 617 P.2d 578, 581 (Haw.Ct.App.1980). If possible, a court will construe an agreement to carry the parties' intentions into effect. Id. But an intent to be bound will not suffice if a contract is not sufficiently definite. Honolulu Waterfront Ltd. v. Aloha Tower Dev. Corp., 692 F.Supp. 1230, 1236 (D.Haw.1988), aff'd, 891 F.2d 295 (9th Cir.1989).
 
 
 22
 The terms of a contract are certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy. Almeida v. Almeida, 669 P.2d 174, 179 (Haw.Ct.App.1983) (citing Restatement (Second) of Contracts Sec. 33 (1981)). A contract is not too indefinite if, even though it does not state an essential term, it provides a method for ascertaining it. See Honolulu Waterfront, 692 F.Supp. at 1235; Etco Corp. v. Hauer, 161 Cal.App.3d 1154, 1161 (1984). Of particular importance in this case is the rule that every contract imposes a duty of good faith and fair dealing. Hawaii Leasing v. Klein, 698 P.2d 309, 313 (Haw.Ct.App.1985).
 
 
 23
 2. The Parties Intended to be Bound by the Agreement.
 
 
 24
 It is clear that Pure and Shasta intended to be bound by the Agreement. The legal structure and formality of the language of the Agreement is that of a formalized contract. When the parties wished to clarify a discrepancy in the Agreement, they did so by formal amendment, twice. The appropriate officers in both companies signed all of the necessary documents, and the parties used the word contract when referring to the relationship. Mr. Smith, Shasta's chief financial officer, conceded on cross examination that the Agreement was not merely a letter of intent. Clearly the parties intended to be bound, and, therefore, we will try to enforce that intent. Sing Chong, 617 P.2d at 581.
 
 
 25
 3. Agreement to Roll Out 750,000 cases in the Western Region.
 
 
 26
 Pure introduced other evidence at trial that was consistent with an intent to be bound contractually. It pointed to an oral agreement with Shasta that the initial roll out was to be for 750,000 cases in the first year and that the area of geographic distribution was to be Shasta's Western Region: California, Nevada, Arizona, and New Mexico. Pure also points to several documents that support such an agreement: an internal Shasta expenditure request that anticipated a roll out of 750,000 cases in the first year; a letter from the Shasta vice-president in charge of the Western Region saying he enjoyed the opportunity to review the joint venture in the Western Region; several letters by Pure's president discussing a roll out in the Western Region; Crenshaw's initial marketing plan, which contemplated a broad roll out in California and Arizona; the San Diego Plan, which contemplates a roll out to the Western Region upon successful test marketing; the Ryan plan, which called for an all California roll out with numbers comparable to 750,000; a letter by Horrigan to Pure's president saying that Shasta intended to distribute PHSW through the United States; and Amendment No. 2, which called for a different marketing plan after the San Diego plan had been rejected. Pure also points to deposition and trial testimony of Crenshaw, Horrigan, and Pure's president.
 
 
 27
 Shasta points out that some of the evidence is inconsistent with a Western Region roll out. It is true that some of the proposals considered involved geographic areas for distribution that did not correspond exactly to Shasta's Western Region, but the plans did involve a large scale roll out encompassing the most important state in the Region, California. Moreover, they evidence good faith efforts to design a scheme that conformed to the framework of the contract. These proposals with their different geographic parameters suggest that alternatives were being considered which were consistent with a roll out in Shasta's Western Region.
 
 
 28
 4. Terms of the Agreement.
 
 
 29
 The district court held the Agreement was unenforceable because the parties had failed to agree to four essential terms: the geographic area of distribution, the minimum distribution amounts for the two year introductory period, the minimum sales amounts after the introductory period, and the marketing plan. Looking to the terms of the Agreement as supplemented by the Western Region plan, we find that they were sufficiently definite or reasonably ascertainable for the contract to be enforceable.
 
 
 30
 We think the district court insisted on a degree of certainty that is not a prerequisite to the existence of the type of contract before it. While it is true a successful relationship between Pure and Shasta might well have culminated in terms meeting the trial court's criteria, it is also true that Pure and Shasta put in place a framework sufficiently precise to impose upon both parties an obligation to bargain in good faith about the precise area of distribution, sales quotas, and marketing plans. In effect, each party acquired from the other a commitment to attempt in good faith to reach a mutually-satisfactory set of specific resolutions of the issues embraced by the agreement. Moreover, here the parties did reach important specific agreements before the relationship was ruptured. We examine the geographic area of distribution first, followed by the sales quotas and the marketing plan.
 
 
 31
 a. Geographic Area of Distribution.
 
 
 32
 This term was made definite by agreement. The Agreement sets the outer boundaries of Shasta's geographic marketing and distributing obligations as the continental United States. The Agreement contemplates an initial introduction of PHSW into a portion of the American marketplace before expanding to the whole country. The Agreement says the parties will concurrently agree on the geographic area for initial distribution. The parties in fact agreed that the geographic area of distribution was to be Shasta's Western Region. With this separate agreement, the jury could determine and was justified in finding that Shasta had breached the Agreement.
 
 
 33
 b. Minimum Sales Amounts.
 
 
 34
 Both the introductory and the post-introductory quotas were ascertainable. The Agreement tied the post-introductory sales figures to the marketing plan. Pure also presented testimony that the introductory sales figures were to come from the marketing plan. Because the initial scope of the distribution had been set at 750,000, the exact quotas to be decided upon are clearly limited both by this number and the general obligation of good faith. With these limits, the jury could determine and was justified in finding that Shasta had breached the Agreement.
 
 
 35
 c. The Marketing Plan.
 
 
 36
 The substance of the marketing plan is also ascertainable. The Agreement required Shasta to develop a marketing plan for PHSW. The Agreement stated that Shasta must use its "best efforts" to market PHSW and further defined the substance of the marketing plan by stating that the plan must require Shasta to "expend sufficient funds." Because the scope of the marketing plan was limited by the 750,000 case roll out in the Western Region, these clauses, together with the obligation to act in good faith, are sufficient to define Shasta's obligations in preparing the marketing plan. Again, the jury could determine and was justified in finding that Shasta had breached the Agreement.
 
 
 37
 Construing all of the facts in Pure's favor, the terms of the Agreement were sufficiently definite or ascertainable to create an enforceable contract.
 
 
 38
 B. The Effect of Pure's Breach.
 
 
 39
 Shasta argues that the JNOV can be affirmed on the independent basis that the jury found that Pure had materially breached the Agreement and this precludes any recovery. The jury answered "Yes" to the special verdict question that asked, "Did Pure materially breach the agreement between Pure and Shasta?" The jury also answered "Yes" to the question that asked, "Did Pure materially breach the contract pack agreement?" The JNOV cannot be upheld on this ground.
 
 
 40
 It is basic contract law that a party cannot insist on performance of a contract that it has materially breached. Windward Partners v. Lopes, 640 P.2d 872, 874 (Haw.Ct.App.1982). But a court also has a duty to harmonize jury answers to make a fair reading of them if possible. Gallick v. Baltimore & Ohio R.R., 372 U.S. 108, 119 (1963).
 
 
 41
 While it is not entirely clear why the jury answered the special verdict questions the way it did, a rational explanation is that it treated Pure's breach of the Contract Pack Agreement as a breach of the Agreement; Amendment No. 2 specifically incorporated the Contract Pack Agreement into the September 19th Agreement. The question then arises why Pure's breach did not excuse Shasta's performance of its obligations. The answer, in part, is that Shasta's breach preceded Pure's; an answer, however, that, in turn, suggests that Pure's duty to perform the Contract Pack Agreement should have been excused. An excuse would have been proper were Shasta's performance a constructive condition precedent to that of Pure's. The jury obviously rejected this construction of the contract. We cannot say it was reversible error to have done so. Therefore, on remand, we direct that Shasta's verdict against Pure, in the amount of $353,342, be reinstated.
 
 
 42
 C. The Damage Award Was Proper.
 
 
 43
 Shasta claims that the JNOV could be affirmed solely on the basis that Pure failed to establish its damages with the reasonable certainty. Shasta characterizes Pure's evidence of damages as speculative and based on unrealistic assumptions. Shasta points to the subsequent failure of PHSW as an indication of the baselessness of the evidence offered by Pure. The jury awarded Pure $1.4 million for Shasta's breach. We cannot uphold the JNOV on this ground.
 
 
 44
 A plaintiff may recover damages for lost profits for a new business if it can show those future profits with reasonable certainty. Chung v. Kaonohi Center Co., 618 P.2d 283, 291 (Haw.1980). In Chung, the Hawaii Supreme Court said, "It is now generally held that the uncertainty which prevents a recovery is uncertainty as to the fact of damage and not as to its amount." Id. at 290-91 (quoting Ferreira v. Honolulu Star-Bulletin, Ltd., 356 P.2d 651, 656 (Haw.1960)). Absolute certainty is not required, but the jury must be guided by some rational standard in making an award. Id.
 
 
 45
 Shasta does not challenge the certainty of the injury, but simply the certainty of the amount. Pure put on a qualified expert that testified as to market share potential if Shasta had marketed and distributed PHSW. Pure put on another expert to testify as to the revenues it would have received based on those assumptions. The market share numbers were not altogether different from those seen in the Crenshaw or Ryan plans. The damages were supported by the evidence.
 
 
 46
 Shasta also argues that a plaintiff cannot recover both lost profits and lost value of a business. Pure asked for approximately $2.8 million in lost revenues and $8 million in lost value of the business, but the jury awarded only $1.4 million. There is no way to tell what portion, if any, comes from lost value of the business. The JNOV cannot be upheld on the grounds of improper damages.[4]
 
 
 47
 D. National Can Be Held Liable as Shasta' Alter Ego.
 
 
 48
 National, Shasta's parent company, asks this court to reverse the jury's finding that it was the alter ego of Shasta. We decline the invitation.
 
 
 49
 The issue of corporate disregard is generally submitted to the jury. American Protein Corp. v. AB Volvo, 844 F.2d 56, 59 (2d Cir.), cert. denied, 488 U.S. 852 (1988). Generally, courts are reluctant to disregard the separateness of corporate entities. E.g., Kashfi v. Phibro-Salomon, Inc., 628 F.Supp. 727, 732-33 (S.D.N.Y.1986). Hawaii courts will pierce the corporate veil only where recognition of the corporate fiction would bring injustice and inequity or the corporate fiction was used to perpetrate a fraud or defeat a rightful claim. Chung v. Animal Clinic, Inc., 636 P.2d 721, 723 (Haw.1981).
 
 
 50
 National argues that there was no substantial evidence to support an alter ego finding. Pure offers the following facts to support the jury's alter ego finding: National was organized to acquire Shasta; National owns 100% of Shasta; National reincorporated Shasta; National's only business during the relevant time period was Shasta; the financial statements of the two companies show the same amount for total sales; the two companies filed consolidated tax returns; there was significant overlap in personnel; Smith, the chief financial officer of both companies, took over the Pure negotiations; the companies shared the same chief executive officer; Tim Healy, a National officer, participated in the Pure negotiations; a letter was sent to Pure on National letterhead; and there were loans between the two companies.
 
 
 51
 The jury's finding of fact should be reversed only if clearly erroneous. Wolfe, 798 F.2d at 1243 n. 2. The jury's determination that National was the alter ego of Shasta was not clearly erroneous.
 
 
 52
 We reverse the JNOV and remand to the district court to reinstate the $1.4 million verdict in favor of Pure.
 
 
 53
 REVERSED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Section 5, Territory, read: SHASTA shall have the right to distribute [PHSW] throughout the United States (excluding Hawaii). Concurrently with the execution of this Agreement SHASTA and PURE shall agree upon the specific geographic distribution areas to be served by SHASTA and minimum amounts of distribution for such areas at the end of the two-year introductory period. In the event that SHASTA has not met the agreed upon minimum monthly distribution amounts agreed upon after two years from the date of this Agreement, PURE may give SHASTA notice of its intention to appoint another distributor
 Together with and as part of SHASTA's marketing plan, SHASTA and PURE shall establish minimum amounts of annual sales for the entire continental United States. In the event that SHASTA shall fail to reach the minimum amount of annual sales for any two consecutive years at any time after the end of the two-year introductory period PURE shall have the right to cancel this Agreement on six months written notice to SHASTA.
 
 
 [2]
 Section 6, Marketing, read: SHASTA shall use its best efforts to market [PHSW]. Within three months after the execution of this Agreement Shasta shall prepare and deliver to PURE a marketing plan indicating the steps that SHASTA will take to market [PHSW]. The marketing plan shall require SHASTA to expend sufficient funds for the promotion and marketing of [PHSW]
 
 
 [3]
 The Agreement specifically provides that Hawaiian law governs
 
 
 [4]
 Neither party challenges the district court's amendment of the amount awarded to Shasta for Pure's breach of the Contract Pack Agreement, and therefore, we assume the parties accept the modification